IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

LETECIA STAUCH,

      **Plaintiff,**

      v.                              CASE NO.  24-3027-JWL

JEFF ZMUDA, et al.,

      **Defendants.**

## MEMORANDUM AND ORDER

Plaintiff brings this pro se civil rights action under 42 U.S.C. § 1983.  Plaintiff is in custody at the Topeka Correctional Facility in Topeka, Kansas ("TCF").  Plaintiff is a Colorado Department of Corrections' ("CDOC") prisoner housed at TCF through the Interstate Corrections Compact.  The Court granted Plaintiff leave to proceed in forma pauperis.  On March 15, 2024, the Court entered a Memorandum and Order to Show Cause (Doc. 11) ("MOSC"), ordering Plaintiff to show good cause why her Complaint should not be dismissed for the reasons set forth in the MOSC, or to file an amended complaint to cure all the deficiencies.  Plaintiff filed an Amended Complaint (Doc. 12), and on April 29, 2024, the Court entered a Memorandum and Order (Doc. 13) ("M&O") dismissing Plaintiff's claims regarding her security classification and housing assignment at TCF, and dismissing Plaintiff's claims against Valerie Watts and Centurion.

The Court found that the proper processing of Plaintiff's remaining claims could not be achieved without additional information from appropriate Kansas Department of Corrections ("KDOC") officials.  *See Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978); *see also Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991).  Accordingly, the Court ordered the KDOC officials to

prepare and file a *Martinez* Report regarding the remaining claims. The *Martinez* Report (Doc. 24) (the "Report") has now been filed. The M&O provides that "[o]nce the report has been received, the Court can properly screen Plaintiff's remaining claims under 28 U.S.C. § 1915A." (Doc. 13, at 11.) The Court's screening standards are set forth in the MOSC.

## I. Nature of the Matter Before the Court

Plaintiff's allegations in her Amended Complaint are set forth in detail in the M&O. In summary, she raises claims regarding the denial of court access, Eighth Amendment violations based on her conditions of confinement at the TCF, claims regarding her freedom to practice her religion at TCF, and retaliation.

Plaintiff names the following remaining defendants: Jeff Zmuda, KDOC Secretary of Corrections; Darcie Holthaus, KDOC Secretary of Corrections Designee and Interstate Corrections Compact Coordinator; Donna Hook, TCF Warden; (fnu) Dietrick, TCF Correctional Officer ("CO"); Dalton Hartpence, TCF Administration; Larry Turner, CDOC Designee and Interstate Corrections Office; Holly Chavez, TCF Facility Service Administrator; and (fnu) Van Dyke, 1st Sgt/Disciplinary Administrator at TCF. Plaintiff seeks injunctive relief to prevent continued violations and compensatory damages. (Doc. 12, at 6.)

## II. The Report

The Report addresses the remaining claims in this case, and provides as follows:

### A. Count I.

The complaint states that Holly Chavez, TCF's Facility Service Administrator, denied Plaintiff the ability to add her attorney to her Allowed Calling List from August to December of 2023. (Doc. 12, p. 7). Ms. Chavez denies having received any such request from Plaintiff. (Exhibit 2, ¶ 5). Ms. Chavez would not have been the appropriate person to make the request(s) to since she does not participate in that process, nor does she manage the lists. (Exhibit 2, ¶ 6).

Internal Management Policy and Procedure ("IMPP") 10-

111D, Section III.E, sets forth the process for residents to add an attorney to their Allowed Calling List. (Exhibit 3, p. 5). Accordingly, residents are required to fill out an Allowed Calling List Request Form and sign it, along with a signature from their unit team. The unit team then sends the form to TCF's Resident Technology Administrator and TCF's Resident Telephone Service provider for review and entry.

On October 29, 2023, Plaintiff sent an electronic message to her unit team requesting an attorney from Colorado be added to her Approved Calling List. (Exhibit 10, p. 1 & 2). However, TCF's Resident Technology Administrator, Brandon Kennedy, has not received an Approved Calling List Form from Plaintiff. (Exhibit 4, ¶ 1-3). Plaintiff's unit team has also not received or signed an Approved Calling List Form from Plaintiff. (Exhibit 5, ¶ 7). Ms. Chavez is not a part of Plaintiff's unit team, nor is she a Resident Telephone Service provider. (Exhibit 2, ¶ 3).

Plaintiff claims that she appealed the alleged denial to TCF's Warden, Dona Hook, and then to the KDOC's Secretary, Jeff Zmuda. (Doc. 12, p. 7). A thorough review of Plaintiff's grievances and requests since her date of arrival at TCF did not yield any documented appeal. Warden Hook denies having received or responded to an appeal regarding Plaintiff's Approved Calling List. (Exhibit 6, ¶ 3). The Secretary's Designee, Darcie Holthaus, who reviews grievances that are appealed to Secretary Zmuda, denies having received or reviewed any such appeal. (Exhibit 7, ¶ 3).

Alternatively, under IMPP 10-111D, Section III.E.3.a, attorneys may place confidential calls with their clients after submitting an Application for Registration as a Registered Attorney, which is Attachment B of the IMPP. (Exhibit 3, p. 5, 6, & 9). This is available even if a resident has not added their attorney to their Approve[d] Call List. Plaintiff's attorney contacted the KDOC on July 10, 2024, in which he conveyed his interest in having a confidential call with Plaintiff. The attorney was provided the registration form and returned it completed on July 10, 2024; it was approved on July 11, 2024. (Exhibit 20). Prior to this development, no evidence has been found to support either party attempting to place a call to the other.

Plaintiff next alleges that mail she sends to her attorney has been confiscated and tampered with by TCF's Classifications Administrator, Dalton Hartpence. (Doc. 12, p. 7). Plaintiff further claims this has happened in front of an unidentified TCF officer. *Id*. The TCF tracks all outgoing and incoming mail. Plaintiff has sent 16 items of legal mail since her arrival at the TCF. (Exhibit 11). Plaintiff does not appear to have attempted to send her Colorado attorney legal mail but has sent legal documents

and/or correspondence to other parties. (Exhibit 11).[1]

Mr. Hartpence denies having confiscated or tampered with Plaintiff's mail. (Exhibit 8, ¶ 4). Since he is not a member of Plaintiff's unit team or facility security, he would not have had the ability to interfere with Plaintiff's legal mail. (Exhibit 8, ¶ 3). Plaintiff does not appear to have submitted a grievance or other complaint to TCF staff regarding her legal mail being confiscated or tampered with. (Exhibit 2, ¶ 8). Plaintiff did not appeal any claim or grievance regarding confiscated or tampered legal mail to the Secretary for review. (Exhibit 7, ¶ 7).

Finally, Plaintiff claims that shortcomings in TCF's legal library hindered her ability to pursue litigation in Colorado. (Doc. 12, p. 8). On December 20, 2023, Plaintiff filed a grievance stating the TCF's legal library did not allow her access to Colorado's statutes. (Exhibit 10, p. 3). Plaintiff was advised by Ms. Chavez that TCF staff would provide her with the specific statute(s) she requires. (Exhibit 10, p. 4). Plaintiff's complaint does not specify what, exactly, TCF's legal library is not sufficiently providing her.[2]

## B. Count II.

Plaintiff claims that she has been, and is still being, exposed to frequent sewage backups in her cell and other cells near her. (Doc. 12, p. 9). Plaintiff has been housed in 10 cells since her arrival at TCF. (Exhibit 5, ¶ 4). TCF's Physical Plant Supervisor, Alfred Schimmel, who oversees the facility's maintenance and environmental conditions, confirmed that no sewage backups have been observed in any of TCF's cells, including the 10 cells Plaintiff has resided. (Exhibit 9, ¶ 3).

While no sewage has entered residential cells, wastewater has backed up into certain showers.  (Exhibit 9, ¶ 4). Most of these backups are the result of residents intentionally clogging toilets and sinks with clothing or bedding, which causes the drainage water to rise in the shower area. (Exhibit 9, ¶ 5). When wastewater is reported, maintenance personnel try to immediately respond and block[] off traffic to the area. (Exhibit 9, ¶ 6). TCF is in the process of upgrading its solid waste sewer system to address this issue and it is expected to be completed in 2025. (Exhibit 9, ¶ 7).

Plaintiff claims that there is no hot water available in any of the cells in her unit and that the sinks are inoperable. (Doc. 12, p. 9). TCF heats its water with older water heaters which sometimes take up to a minute to produce heated water in cold

---

[1]  The Court notes that it does appear from the exhibit that Plaintiff *received* mail from her Colorado attorneys on September 27, 2023,  March 13, 2024, and May 21, 2024. (Doc. 24–11.)

[2]  The Court notes that Darcie Holthaus also declares that she has "not received any form of appeal to the Secretary from Ms. Stauch regarding  . . . deficiencies with TCF's law library . . .."  (Doc. 24–7, at 2.)

weather. (Exhibit 9, ¶ 8). Hot water is available in all TCF sinks and showers, though it may take a few seconds to become available. (Exhibit 9, ¶ 9). At no point have any of Plaintiff's current or prior cells been without access to heated water. (Exhibit 9, ¶ 10).

TCF conducts a monthly Health and Sanitation Inspection, as required by department policy, which is recorded in a monthly report for all buildings on TCF grounds. All relevant Health and Sanitation Inspection Reports for I Cell House ("ICH"), where Plaintiff has lived since her arrival to TCF on August 14, 2023, have been retrieved. (Exhibit 19). Since August 2023, hot water temperatures have been confirmed to range from 100 degrees Fahrenheit to 120 degrees Fahrenheit for each ICH inspection. (Exhibit 19, p. 5, 10, 15, 20, 25, 30, 35, 40, 45, 50, & 55).[3]

Plaintiff claims that she has been exposed to mold during her time at TCF. (Doc. 12, p. 9). The only document in which Plaintiff mentions mold is in a grievance that claims inadequate medical care from a Centurion nurse. (Exhibit 10, p. 7). Plaintiff did not file a grievance or maintenance request regarding any suspected mold during her time at TCF. (Exhibit 2, ¶ 9; Exhibit 7, ¶ 7; Exhibit 9, ¶ 11). TCF's Maintenance Department investigates all claims of mold and has not identified any species of mold in Plaintiff's current or previous cells. (Exhibit 9, ¶ 12).

Plaintiff claims that she was exposed to contaminated water due to TCF staff failing to alert her to a water advisory warning issued for Shawnee County on January 14, 2024. (Doc. 12, p. 9). The KDHE's advisory was specifically directed at the Metro Topeka Airport Authority and Shawnee County Rural Water District 1C. Out of an abundance of caution, steps were taken to prevent any risk to resident health. (Exhibit 6, ¶ 6).

To ensure each resident was aware of the advisory, including residents that did not have tablet access, unit teams followed up the electronic notice with a verbal notice to their respective residents. (Exhibit 6, ¶ 7). Maintenance staff also posted warnings on all facility water fountains, the facility shut off its water supply, and residents were issued bottles of water. (Exhibit 6, ¶ 8). Plaintiff did not appeal any claim or grievance regarding alleged contaminated water exposure to the Secretary for review. (Exhibit 7, ¶ 7).

Plaintiff claims that her cell has inadequate ventilation which has forced her to inhale toxins. (Doc. 12, p. 10). The TCF has contracted with P1 Groupe, Inc., which maintains air quality and ventilation systems for the facility. (Exhibit 9, ¶ 13). The Maintenance Department has not found inadequate ventilation in

---

[3] The Court notes that the monthly inspection reports state that "[a]ctual temperatures in showers and washbasins in restrooms should be checked with a handheld thermometer . . .." *See, e.g.,* Doc. 24–19, at 5.

Plaintiff's current or previous cells or in the I cellhouse generally. (Exhibit 9, ¶ 14). Plaintiff did not appeal any claim or grievance regarding inadequate ventilation in her cell to the Secretary for review. (Exhibit 7, ¶ 7).

Plaintiff claims that TCF staff denies her access to cleaning products. (Doc. 12, p. 10). Plaintiff's Unit Team Manager, Linda Hull-Viera, does not recall a single instance in which Plaintiff was denied the ability to retrieve cleaning products or be provided cleaning products by security personnel. (Exhibit 5, ¶ 5). To the contrary, residents are strongly encouraged to utilize[] cleaning supplies to maintain their living spaces. (Exhibit 5, ¶ 6). Doing so provides a safer and healthier environment for the resident and for security personnel who conduct cell searches. (Exhibit 5, ¶ 6). Plaintiff did not appeal any claim or grievance regarding access to cleaning supplies to the Secretary for review. (Exhibit 7, ¶ 7).

Plaintiff claims that leaking windows allow for temperature extremes and vermin access to her cell. (Doc. 12, p. [11]). No evidence of window leaks, mold, or vermin have been found by TCF's Maintenance Department in any of the cells that Plaintiff has resided. (Exhibit 9, ¶ 12). Plaintiff's claim that her cell experiences extreme temperature changes is unsubstantiated and has not been reported to TCF's Maintenance Department. (Exhibit 9, ¶ 11). Since Plaintiff has lived at TCF, not one Health and Sanitation Inspection Report has found a window opening that would allow a bug/rodent infestation in ICH. (Exhibit 19, p. 5, 10, 15, 20, 25, 30, 35, 40, 45, 50, & 55). Plaintiff did not appeal any claim or grievance regarding leaking windows, temperature extremes, or vermin to the Secretary for review. (Exhibit 7, ¶ 7).

Plaintiff claims that the food she receives is inadequately prepared and does not meet nutritional guidelines. (Doc. 12, p. 11). TCF contracts with Aramark, Inc. for resident food services. Aramark has 2 full-time nutritionists, Cynthia Irizarry and Kate Crowley, that ensure meals are nutritionally compliant with state and federal standards. (Exhibit 6, ¶ 9). TCF is in the process of renovating its kitchen area and meals are being prepared in a mobile facility on TCF grounds. (Exhibit 6, ¶ 10).

Meals are placed in portable food warmers and are distributed from the mobile facility as quickly as possible. Reports of cold meals are uncommon and are addressed on a case-by-case basis to ensure it does not occur twice. Meals are distributed from this mobile facility as quickly as possible in portable food warmers. (Exhibit 6, ¶ 12). The warmers are sufficient to keep meals warm until they reach the resident. (Exhibit 6, ¶ 12). All meals are prepared in a sanitary manner and with the same care as if they were being prepared in the facility kitchen. (Exhibit 6, ¶ 11). Plaintiff did not appeal any claim or grievance regarding

food sanitation or nutrition concerns to the Secretary for review. (Exhibit 7, ¶ 7).

Plaintiff also alleges the TCF retaliated against her for filing a PREA complaint by removing her from a porter position and for issuing her a disciplinary report for failing to appear for work. (Doc. 12, p. 14). On December 13, 2023, Plaintiff was issued a disciplinary report for failing to report to work for two days, under K.A.R. 44-12-401b. (Exhibit 12, p. 1). Plaintiff was found not guilty, due to her participating in a religious holiday on the first missed day and for filing a PREA complaint on the second day; the disciplinary report was dismissed. (Exhibit 12, p. 4).

On December 21, 2023, Plaintiff filed a grievance alleging the disciplinary report and her firing from a porter job were both retaliation by Ms. Hull-Viera for Plaintiff filing a PREA complaint. (Exhibit 10, p. 12). Following staff responses, TCF's Warden responded to Plaintiff's grievance directly on February 20, 2024, and provided Plaintiff with her investigatory finding that she was not fired due to retaliation. (Exhibit 10, p. 14). Plaintiff submitted a similar grievance on December 15, 2023, claiming that her unit team was retaliating against her and that TCF's PREA Coordinator was not assisting her. (Exhibit 10, p. 15). Ms. Chavez responded to this complaint with a summary of Plaintiff's consistent lack of cooperation with Ms. Watts. (Exhibit 10, p. 16). Plaintiff did not appeal any claim or grievance alleging the disciplinary report was a result of PREA retaliation to the Secretary. (Exhibit 7, ¶ 8).

TCF's PREA Compliance Manager, Valerie Watts, followed federal PREA Standards and attempted to meet with Plaintiff 30, 60, and 90 days after Plaintiff filed her PREA complaint. (Exhibit 14, ¶ 6-8). Plaintiff refused to meet with Ms. Watts for two of those meetings.[4] (Exhibit 14, ¶ 7 & 8). The purpose of the meetings is to gain additional details of how the resident is being treated following the complaint and to ensure the resident is not facing retaliation from other residents or staff. (Exhibit 14, ¶ 3). Ms. Watts takes the information, if any is provided, and considers ways to address any reported issues to prevent future harm to the resident.  (Exhibit 14, ¶ 4).

### C. Count III.

Plaintiff claims that TCF has denied her the ability to register as Native American and that she must attend smudging under IMPP 10-110D. (Doc. 12, p. 17). The TCF Chaplain has not

---

[4]  The Court notes that Valeri Watts declares that she conducts the required 30-, 60-, and 90-day meetings, and also holds an additional meeting at 120 days, which "is not required by PREA, but it is something [she does] to give residents more support."  (Doc. 24–14, at 2.)  Watts states that Plaintiff did not participate in the 60-day meeting or the 120-day meeting, and describes Plaintiff "as generally uncooperative."  *Id.*

encountered any complaint or grievance regarding a resident's ability to choose any religious affiliation they prefer upon intake to TCF aside from Plaintiff's claim. (Exhibit 13, ¶ 3). IMPP 10-110D, which regulates religious services for all KDOC facilities, Section III states that residents are not allowed to fully engage in the practices of other religions that they are not formally affiliated to. (Exhibit 15, p. 2). Plaintiff must be formally affiliated to a faith that engages in church services to attend and participate in church services.

Plaintiff claims she was told she could not attend church services if recognized as Jewish and that she was forced to choose one religion and change her religious affiliation. (Doc. 12, p. 17). Plaintiff was not denied the ability to attend Jewish church services; because Plaintiff was the only Jewish resident in her building at that time, there were no Jewish church services available. (Exhibit 13, ¶ 4). On September 6, 2023, Plaintiff submitted a religious grievance in which she requests permission to attend Christian/Protestant church services while still affiliated as Jewish. (Exhibit 10, p. 17).

Mr. Waller notified Plaintiff that she would need to change her affiliation, per KDOC policy, to attend and participate in Christian/Protestant church services. (Exhibit 10, p. 18[5]). On October 2, 2023, Plaintiff voluntarily requested a Change of Religion Request Form to switch her affiliation from Jewish to Christian/Protestant. (Exhibit 16, p. 2). Residents are not able to choose more than one religious affiliation per IMPP 10-110D, Section IV. (Exhibit 15, p. 7). Residents are always free to practice as many religions as they prefer in an individual capacity.

Plaintiff claims that Darcie Holthaus told her the following quote: "We do not recognize Jewish where you are housed and to take it up with Colorado." (Doc. 12, p. 17). Ms. Holthaus denies having told this to Plaintiff. (Exhibit 7, ¶ 5). The misquoted statement likely arose from Ms. Chavez's response to a grievance Plaintiff submitted on September 7, 2023. (Exhibit 10, p. 19). Ms. Chavez stated: "According to your religious affiliation's documentation, you are listed as Jewish. We currently do not have any volunteers to lead Jewish services, and you are the only resident on the I/J side of the facility to list Jewish as their religious affiliation. Our policy IMPP 10-110D states that in order to schedule a group service there must be 2 or more with approval from the Chaplain." (Exhibit 10, p. 20).

Plaintiff also claims that the TCF Chaplain told her that her

---

[5] The Report notes that Mr. Waller mistakenly refers to a General Order ("G.O.") in his grievance response on page 18 of Exhibit [10], when he meant IMPP 10-110D. The incorrect reference notwithstanding, his response is accurate.

religious freedoms were being limited by TCF leadership and that male residents had greater freedom. (Doc. 12, p. 18). TCF's Chaplain, Jesse Waller, denies having told Plaintiff that her religious freedoms were being limited by any person or entity at TCF. (Exhibit 13, ¶ 5). Mr. Waller also denies having told Plaintiff that male residents have any greater freedom to pursue religious interests than female residents. (Exhibit 13, ¶ 6). Plaintiff is, in fact, the one who has alleged that female residents are treated differently than male residents for religious services and not Mr. Waller. (Exhibit 10, p. 22). All residents have equal access and involvement in religious services regardless of their sex or gender. (Exhibit 13, ¶ 6).

**D. Count IV.**

Plaintiff claims that she was denied access to her TCF tablet as a form of retaliation for filing a PREA complaint and for filing grievances alleging TCF policy violations. (Doc. 12, p. 20). Plaintiff also claims that she was issued a disciplinary report for mailing out gifts as a form of retaliation and as an attempt to prevent her from filing more electronic grievances. (Doc. 12, p. 20).

Plaintiff's tablet was confiscated on February 1, 2024, after the TCF's Enforcement, Apprehensions, and Investigations ("EAI") unit became aware that she had sold a pair of her sweatpants on eBay through a third party for $200. (Exhibit 12, p. 7). Plaintiff's tablet was withheld from her during the investigation and after she was found guilty of violating K.A.R. 44-12-209 for selling and mailing the sweatpants. (Exhibit 12, p. 7 & 8). Violation of K.A.R. 44-12-209 is a Class III offense. (Exhibit 17).

Plaintiff regained electronic access to the tablet on May 1, 2024, but with electronic restrictions. (Exhibit 5, ¶ 11). Plaintiff was not denied access to her tablet or issued a disciplinary report as a form of retaliation, but because she violated KDOC policy. (Exhibit 5, ¶ 12). Plaintiff did not appeal any claim or grievance alleging her tablet access was removed due to filing a PREA complaint, as a form of retaliation, to the Secretary. (Exhibit 7, ¶ 8).

Plaintiff claims she was denied access to evidence during her disciplinary hearing, that the presiding officer denied her due process, and that the officer threatened her. (Doc. 12, p. 2[2]). Ms. Van Dyke denies having threatened Plaintiff at any time. (Exhibit 18, ¶ 4). Plaintiff was afforded the opportunity to address the evidence and charge against her during the hearing. (Exhibit 18, ¶ 5). In her testimony, Plaintiff admitted to performing the actions of providing her sweatpants to a third party so they could be sold for financial gain; this was sufficient to find her guilty. (Exhibit 18,

¶ 6).

Ms. Van Dyke denies having planned or written a punishment before the hearing began. (Exhibit 18, ¶ 7). The punishment Plaintiff received was not excessive or for a prolonged period of time that would be unusual for a Class III violation. (Exhibit 18, ¶ 8). Additionally, Plaintiff was not denied access to the grievance process after being found guilty and had access to physical forms of religious materials and legal resources, including resources in TCF's library, while she was restricted from tablet use. (Exhibit 18, ¶ 9 & 10).

Plaintiff claims her cell underwent lengthy room searches as a form of retaliation and that officers conducting the searches read through her legal mail. (Doc. 12, p. 2[3]). Plaintiff has not filed a grievance or complaint alleging lengthy room searches are being performed out of retaliation. She has also not submitted a complaint to TCF staff alleging her legal mail has been read during a cell search. (Exhibit 5, ¶ 13). According to Ms. Hull-Viera, the only lengthy cell search potentially applicable would not have been a search, but a pack-out of Plaintiff's property when she was placed on Crisis Level. (Exhibit 5, ¶ 14). No evidence has been found supporting Plaintiff's claim that her legal mail was read during this movement or other staff entries to her cell.

(Doc. 24, at 3–13.)

## III. DISCUSSION

### 1. Count I – Court Access

Plaintiff alleges in Count I of her Amended Complaint that she was denied court access when she was denied phone access to her attorney and when Defendants interfered with her legal mail. Plaintiff alleges that from August 2023 to December 2023, she was denied phone access to her attorney regarding her direct criminal appeal, and when she attempted to write to her attorney her legal mail was confiscated. She claims the mail tampering has taken place from September 2023 to the present. Plaintiff claims that she was forced to file a request to represent herself in her direct criminal appeal. She also claims that her legal mail was tampered with when the court presiding over her Colorado action regarding her conditions of confinement attempted to reach her.

Plaintiff has not sufficiently alleged that she was denied access to her attorneys for her criminal appeal in Colorado.  Although Plaintiff claims that she was denied the ability to add her attorney to her Allowed Calling List from August to December of 2023, the Report shows that Plaintiff did not follow the proper procedures for adding her attorney to the call list, and when her attorney contacted the KDOC and conveyed his interest in having a confidential call with Plaintiff, he was provided the registration form.  He completed it on the same day, and it was approved the following day.  The Report provides that prior to this, no evidence has been found to support either party attempting to place a call to the other.

Plaintiff also alleges that her mail to her Colorado attorneys "has been confiscated by Dalton Hartpence even in the presence of a SSGT."  (Doc. 12, at 7.)  Plaintiff alleges that this mail tampering started in September 2023 and was ongoing at the time she filed her Amended Complaint on March 26, 2024.  *Id*.  The Report provides that TCF tracks all outgoing and incoming mail, and Plaintiff has sent 16 items of legal mail since her arrival at TCF.  The Report attaches documentation regarding her mail and states that Plaintiff does not appear to have attempted to send her Colorado attorney legal mail but has sent legal documents and/or correspondence to other parties.  The Court noted above that it does appear from the exhibit to the Report that Plaintiff *received* mail from her Colorado attorneys on September 27, 2023, March 13, 2024, and May 21, 2024.  (Doc. 24–11.)

Plaintiff does not identify what mail she believes was confiscated by Defendant Hartpence.  In the Report, Hartpence denies having confiscated or tampered with Plaintiff's mail, and provides that since he is not a member of Plaintiff's unit team or facility security, he would not have had the ability to interfere with Plaintiff's legal mail.

Plaintiff continues to claim that shortcomings in TCF's legal library hindered her ability to pursue litigation in Colorado. (Doc. 12, at 8.)  Plaintiff claims she does not have access to courts in Colorado.  *Id*.  The Court advised Plaintiff in the MOSC that Plaintiff's criminal appeal in Colorado is not accessible because it is "suppressed."  (Doc. 11, at 11.)  The Court was also unable to access her case online, and could only view the information on the Case Information document.  *Id*.  The document, which was attached to the MOSC, provides that: "This case is suppressed and available only to case parties."  *Id*.  The Court found in the MOSC that it appears that Plaintiff would face the same challenge trying to access the information online, including through Lexis, at any facility. *Id*.  Because the case information document provides that the case is available only to parties, the Court advised Plaintiff to contact the appellate court or her attorney to determine how to gain access.  *Id*.

The Court found in the MOSC that it is well-established that a prison inmate has a constitutional right of access to the courts.  However, it is equally well-settled that in order "[t]o present a viable claim for denial of access to courts, . . . an inmate must allege and prove prejudice arising from the defendants' actions."  *Peterson v. Shanks,* 149 F.3d 1140, 1145 (10th Cir. 1998) (citations omitted); *Lewis v. Casey*, 518 U.S. 343, 349 (1996) ("The requirement that an inmate . . . show actual injury derives ultimately from the doctrine of standing.").

An inmate may satisfy the actual-injury requirement by demonstrating that the alleged acts or shortcomings of defendants "hindered his efforts to pursue" a non-frivolous legal claim. *Lewis*, 518 U.S. at 351–53; *see also Burnett v. Jones*, 437 F. App'x 736, 744 (10th Cir. 2011) ("To state a claim for violation of the constitutional right to access the courts, a prisoner 'must demonstrate actual injury . . .—that is, that the prisoner was frustrated or impeded in his efforts

to pursue a nonfrivolous legal claim concerning his conviction or his conditions of confinement.'") (quoting *Gee v. Pacheco*, 627 F.3d 1178, 1191 (10th Cir. 2010)).

The Supreme Court plainly held in *Lewis* that "the injury requirement is not satisfied by just any type of frustrated legal claim." *Lewis*, 518 at 354. Rather, the injury occurs only when prisoners are prevented from attacking "their sentences, directly or collaterally" or challenging "the conditions of their confinement." *Id.* at 355. "Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Id.* (emphasis in original); *see also Carper v. DeLand*, 54 F.3d 613, 617 (10th Cir. 1995) ("[A]n inmate's right of access does not require the state to supply legal assistance beyond the preparation of initial pleadings in a civil rights action regarding current confinement or a petition for a writ of habeas corpus.") (citations omitted).

The right to access the courts does not guarantee inmates the right to a law library or to legal assistance, but merely to "the means for ensuring 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'" *Lewis*, 518 U.S. at 350–51 (quoting *Bounds v. Smith,* 430 U.S. 817, 825 (1977)). The right to access the courts is "only [the right] to present . . . grievances to the courts," and does not require prison administrators to supply resources guaranteeing inmates' ability "to litigate effectively once in court" or to "conduct generalized research." *Id.* at 354, 360.

The Court held in the MOSC that Plaintiff failed to specify the exact legal proceedings that she claims were hindered. (Doc. 11, at 9.) The Court held that she failed to identify the specific legal claims she raised in those proceedings, failed to explain why those claims were nonfrivolous, and failed to explain how those nonfrivolous claims were prejudiced by her

inability to access law library materials.  *Id.* (noting that these requirements were set forth in *Counts v. Wyoming Dep't of Corr.*, 854 F. App'x 948, 950–52 (10th Cir. 2021) (unpublished)).

Plaintiff alleges in her Amended Complaint that she has "[n]ever filed an action against a prison or in the state of Kansas" but states that she has a "pending" case in Colorado against the El Paso County Jail.  (Doc. 12, at 5.)   Plaintiff claims that her "open prison conditions case in Colorado" challenges conditions while housed in the county jail.  *Id.* at 8.  She claims that the "shortcomings in the library have hindered efforts to continue pursuing it."  *Id.*  She claims that the Colorado court tried to reach her in December 2023, and "once again [her] legal mail was tampered with."  *Id.*  Plaintiff claims that she then received a letter in February 2024, "saying it would be dismissed because [Plaintiff] did not have access and resources to respond, making it untimely."  *Id.*  Plaintiff has still failed to show an actual injury.  When she filed her Amended Complaint on March 26, 2024, she still listed the case as "pending" and refers to it as an "open" case.  Furthermore, Plaintiff has failed to comply with the requirements set forth in the Court's MOSC.  She fails to identify the specific legal claims she raised in those proceedings, fails to explain why those claims were nonfrivolous, and fails to explain how those nonfrivolous claims were prejudiced by her inability to access law library materials.  Plaintiff should show good cause why her claims regarding court access and access to her attorney in Count I should not be dismissed for failure to state a claim.

### 2.  Count II – Conditions at TCF

As Count II, Plaintiff alleges cruel and unusual punishment and deliberate indifference to her health and safety.  Plaintiff bases this claim on the following conditions:  exposure to toxins from sewage leaks that cause waste to return to inmates' cells about two times a week; inoperable sinks that lack hot water for sanitation; obvious signs of mold leading to medical

issues; exposure to contaminated water on January 14, 2024, when Defendants failed to advise inmates about a warning from the city of Topeka for 24 hours; inadequate ventilation adding to the exposure to toxins; leaking windows that allow rain, wind, and vermin to enter through the windows; getting cleaning supplies is often an issue; and food is not prepared under clean conditions, is generally cold, and does not follow nutritional guidelines.  Plaintiff alleges that the conditions have caused breathing issues, extreme headaches, dizziness, nausea, daily nose bleeds, and diminished lung capacity.

A prison official violates the Eighth Amendment when two requirements are met. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  "First, the deprivation alleged must be, objectively, 'sufficiently serious.'"  *Id*.  To satisfy the objective component, a prisoner must allege facts showing he or she is "incarcerated under conditions posing a substantial risk of serious harm." *Id.*; *Martinez v. Garden*, 430 F.3d 1302, 1304 (10th Cir. 2005).

The second requirement for an Eighth Amendment violation "follows from the principle that 'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.'" *Farmer*, 511 U.S. at 834.  Prison officials must have a "sufficiently culpable state of mind," and in prison-conditions cases that state of mind is "deliberate indifference" to inmate health or safety.  *Id*.  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id*. at 837. "The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'"  *Id*.  It is not enough to establish that the official should have known of the risk of harm.  *Id*.

Because the sufficiency of a conditions-of-confinement claim depends upon "the particular facts of each situation; the 'circumstances, nature, and duration' of the challenged

conditions must be carefully considered." *Despain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001) (quoting *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000)).  "While no single factor controls . . . the length of exposure to the conditions is often of prime importance." *Id*.  As the severity of the conditions to which an inmate is exposed increases, the length of exposure required to make out a constitutional violation decreases.  Accordingly, "minor deprivations suffered for short periods would not rise to an Eighth Amendment violation, while 'substantial deprivations. . .' may meet the standard despite a shorter duration." *Id*. (citations omitted).

The Report shows that no sewage backups have been observed in any of TCF's cells, including the 10 cells in which Plaintiff has resided; when there is a backup reported for the showers, maintenance personnel try to immediately respond and block off traffic to the area; and TCF is in the process of upgrading its solid waste sewer system to address this issue and it is expected to be completed in 2025.  Plaintiff does not specify an instance where raw sewage was actually present in *her* cell, and mentions exposure to fumes.  She mentions sewage leaks "that causes [sic] the waste to return to *our cells* including other inmates['] feces, waste, etc., causing me to breathe in these fumes including gray water."  (Doc. 12, at 9) (emphasis added).  She also mentions sewage leaks "through rooms" and "the pit" causing "backups and toxins overflowed into our rooms at an increasing rate" and "the issues with toxins and exposure to other feces has continued."  *Id*. at 9–10.  She then states that "[i]t is estimated that it backs up and overflows in our rooms twice a week."  *Id*. at 10.  She adds that "ICH does not have adequate ventilation which adds to the exposure" and that she has been "expos[ed] to toxic substances, sewer gas." *Id*. at 10, 12.  In any event, Plaintiff does not allege that staff failed to timely remedy any plumbing backups.

As for mold, Plaintiff makes an unsupported allegation that "obvious signs of mold" have led to health issues, without indicating where or when she observed mold at TCF.  *Id*. at 10.  A "bare allegation of [the presence of] mold . . . does not create a reasonable inference regarding the sort of threat to [a plaintiff's] mental or physical well being which is necessary for violation of the Eighth Amendment." *Cox v. Grady Cty. Detention Center*, 2008 WL 1925052, at *3–4 (W.D. Okla. April 29, 2008) (citing *Dittmeyer v. Whetsel*, 91 F. App'x 111 (10th Cir. Feb. 11, 2004)).  The Report shows that the only document in which Plaintiff mentions mold is in a grievance that claims inadequate medical care from a Centurion nurse; Plaintiff did not file a grievance or maintenance request regarding any suspected mold during her time at TCF; and TCF's Maintenance Department investigates all claims of mold and has not identified any species of mold in Plaintiff's current or previous cells.

Plaintiff claims that "sinks are inoperable without hot water for sanitation."  (Doc. 12, at 9.)  The Report shows that TCF heats its water with older water heaters which sometimes take up to a minute to produce heated water in cold weather.  Hot water is available in all TCF sinks and showers, though it may take a few seconds to become available.  The Report provides that at no point have any of Plaintiff's current or prior cells been without access to heated water; and since August 2023, hot water temperatures have been confirmed to range from 100 degrees Fahrenheit to 120 degrees Fahrenheit for each ICH inspection.

As for the day of the water advisory, Plaintiff claims that they "were only given two bottles of water in the morning and two at night."  (Doc. 12, at 10.)  The Report states that the KDHE's water advisory on January 14, 2024, was specifically directed at the Metro Topeka Airport Authority and Shawnee County Rural Water District 1C and out of an abundance of caution, steps were taken to prevent any risk to resident health.  To ensure each resident was

aware of the advisory, including residents that did not have tablet access, unit teams followed up the electronic notice with a verbal notice to their respective residents, maintenance staff also posted warnings on all facility water fountains, the facility shut off its water supply, and residents were issued bottles of water.  Plaintiff has acknowledged that she received the bottled water and fails to allege that any delay in receiving notice of the water advisory was the result of deliberate indifference.

Regarding cleaning supplies, Plaintiff states that access to cleaning supplies "is often an issue because SSGTs on duty consistently yell about getting them and threaten to take them away daily."  *Id*.  Plaintiff does not suggest that she has no access to cleaning supplies.  Plaintiff's Unit Team Manager, Linda Hull-Viera, does not recall a single instance in which Plaintiff was denied the ability to retrieve cleaning products or to be provided cleaning products by security personnel.

Plaintiff  also makes the bald conclusion that ICH does not have adequate ventilation.  *Id*.  The Report states that TCF has contracted with P1 Groupe, Inc., which maintains air quality and ventilation systems for the facility, and the Maintenance Department has not found inadequate ventilation in Plaintiff's current or previous cells or in the I cellhouse generally.

Plaintiff claims that "[w]indows leak water and winds are of extreme temps in winter at ICH . . . [v]ermin also enters into some windows."  *Id*. at 11.  Plaintiff does not give any specifics as to when and where she observed leaking windows or vermin entering through unspecified windows.   The Report states that no evidence of window leaks, mold, or vermin have been found by TCF's Maintenance Department in any of the cells that Plaintiff has resided; Plaintiff's claim that her cell experiences extreme temperature changes is unsubstantiated and has not been reported to TCF's Maintenance Department; and since Plaintiff has lived at TCF,

not one Health and Sanitation Inspection Report has found a window opening that would allow a bug/rodent infestation in ICH.

Plaintiff also claims that "food is not prepared under clean conditions and food is generally cold and does not follow nutritional guidelines." *Id*. The Report provides that TCF contracts with Aramark, Inc. for resident food services; Aramark has 2 full-time nutritionists that ensure meals are nutritionally compliant with state and federal standards; and while TCF's kitchen is being renovated, meals are being prepared in a mobile facility on TCF grounds and placed in portable food warmers and distributed as quickly as possible. The warmers are sufficient to keep meals warm until they reach the resident and meals are prepared in a sanitary manner and with the same care as if they were being prepared in the facility kitchen. The Report acknowledges that food is sometimes cold and a temporary result of TCF's kitchen renovations. (Doc. 24, at 13.)

Again, Plaintiff fails to refer to any specific instances or to give any details as to why she believes the food is not prepared under clean conditions or why it does not meet nutritional guidelines. She also fails to give examples of when or how often food is served cold. Similar allegations regarding cold food have been found to be insufficient to show a constitutional violation. *See Redick v. Coy*, 2022 WL 1026892, at *3 (D. Kan. 2022) (plaintiff failed to show that hair in food resulted from deliberate indifference and stating that "[c]ourts have found similar allegations insufficient to establish the violation of a constitutional right") (citing *see, e.g., Green v. Atkinson*, 623 F.3d 278, 281 (5th Cir. 2010) ("A single incident of food poisoning or finding a foreign object in food does not constitute a violation of the constitutional rights of the prisoner affected."); *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992) (ruling that presence of foreign objects in food was insufficient to prove deliberate indifference); *Hamm v.*

*DeKalb Cty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) ("The fact that [prison] food occasionally contains foreign objects or sometimes is served cold, while unpleasant, does not amount to a constitutional deprivation."); *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993) (same); *Ockert v. Beyer*, No. 10–3058–SAC, 2010 WL 5067062 at *2 (D. Kan. Dec. 7, 2010) (finding that a single incident where hair was found in food failed to give rise to a constitutional violation)).

The Eighth Amendment requires prison and jail officials to provide humane conditions of confinement guided by "contemporary standards of decency." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). The Supreme Court has acknowledged that the Constitution "'does not mandate comfortable prisons,' and only those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (internal citations omitted). Indeed, prison conditions may be "restrictive and even harsh." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). "Under the Eighth Amendment, (prison) officials must provide humane conditions of confinement by ensuring inmates receive the basic necessities of adequate food, clothing, shelter, and medical care and by taking reasonable measures to guarantee the inmates' safety." *McBride v. Deer*, 240 F.3d 1287, 1291 (10th Cir. 2001) (citation omitted).

Plaintiff has failed to show deprivations sufficiently grave enough to form the basis of an Eighth Amendment violation. She has also failed to show that any defendant was deliberately indifferent to her health or safety with regard to the conditions set forth above. Plaintiff is given an opportunity to respond to the Report and to show good cause why her claims regarding these conditions at TCF should not be dismissed for failure to state a claim.

### 3. Count II – Medical Care

Plaintiff also alleges deliberate indifference regarding her medical care in Count II.  She claims that there is "an increasing risk that [her] hand will never be restored to its full usefulness."  (Doc. 12, at 12.)  Plaintiff alleges that her right hand was injured by staff and she was told by medical that she could not receive any treatment beyond talking to the doctor in January 2024. *Id*. at 12–13.  Plaintiff alleges that she has "potential permanent nerve damage in [her] right hand." *Id*. at 13.

As the Court found in the MOSC, Plaintiff claims that as she was leaving aerobics her hand was hanging out of the door and the staff member slammed the door on Plaintiff's right ring finger.  (Doc. 11, at 22.)  The Court found that Plaintiff acknowledged that she received medical care for her finger, but argued that the facility failed to follow its own policy for reporting the incident.  *Id*.  Now, Plaintiff claims that she has an increased risk that her hand will never be restored to its full usefulness.  (Doc. 12, at 12.)  She claims that this constitutes deliberate indifference by Centurion because "it is a policy of the Contractor to provide treatment that is below the basic level of standard of care."  *Id*.  Plaintiff alleges that she was told by "medical" that she could not receive any treatment beyond talking to the doctor in January 2024. *Id*. at 12–13.  Plaintiff claims that Centurion is indifferent because they "say that they cannot provide any treatment to restore mobility, assist with the permanent nerve damage and the sharp pains and swelling." *Id*. at 13.

The Eighth Amendment guarantees a prisoner the right to be free from cruel and unusual punishment.  "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation omitted).

The "deliberate indifference" standard includes both an objective and a subjective component. *Martinez v. Garden*, 430 F.3d 1302, 1304 (10th Cir. 2005) (citation omitted). In the objective analysis, the deprivation must be "sufficiently serious," and the inmate must show the presence of a "serious medical need," that is "a serious illness or injury." *Estelle*, 429 U.S. at 104, 105; *Farmer v. Brennan*, 511 U.S. 825, 834 (1994), *Martinez*, 430 F.3d at 1304 (citation omitted). A serious medical need includes "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Martinez*, 430 F.3d at 1304 (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)).

"The subjective component is met if a prison official knows of and disregards an excessive risk to inmate health or safety." *Id.* (quoting *Sealock*, 218 F.3d at 1209). In measuring a prison official's state of mind, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 1305 (quoting *Riddle v. Mondragon*, 83 F.3d 1197, 1204 (10th Cir. 1996)).

A mere difference of opinion between the inmate and prison medical personnel regarding diagnosis or reasonable treatment does not constitute cruel and unusual punishment. *See Estelle*, 429 U.S. at 106–07; *see also Coppinger v. Townsend*, 398 F.2d 392, 394 (10th Cir. 1968) (prisoner's right is to medical care—not to type or scope of medical care he desires and difference of opinion between a physician and a patient does not give rise to a constitutional right or sustain a claim under § 1983).

The Court found in the M&O that Plaintiff failed to show that a named defendant disregarded an excessive risk to her health or safety or that they were both aware of facts from

which the inference could be drawn that a substantial risk of serious harm existed, and also drew the inference.  (Doc. 13, at 10.)

The Court noted that the only healthcare provider Plaintiff names in her Amended Complaint is Centurion.  In the Tenth Circuit, "to hold a corporation liable under § 1983 for employee misconduct, a plaintiff must demonstrate the existence of the same sort of custom or policy that permits imposition of liability against municipalities under *Monell v. Department of Social Services*, 436 U.S. 658, 694 . . . (1978)."  *Wishneski v. Andrade*, 572 F. App'x 563, 567 (10th Cir. 2014) (unpublished) (citations omitted).  A corporation may not be held liable based upon respondeat superior because "vicarious liability is inapplicable to  . . . § 1983 suits." *Rascón v. Douglas*, 718 F. App'x 587, 589–90 (10th Cir. 2017) (unpublished) (quoting *Iqbal*, 556 U.S. at 676); *see also Spurlock v. Townes*, 661 F. App'x 536, 545 (10th Cir. 2016) (unpublished); *Green v. Denning*, 465 F. App'x 804, 806 (10th Cir. 2012) (unpublished) ("An entity 'cannot be held liable *solely* because it employs a tortfeasor—or, in other words, [it] cannot be held liable under § 1983 on a respondeat superior theory.'") (citation omitted); *Williams v. Correct Care Sols.*, No. 19-3075-SAC, 2019 WL 2005920, at *2 (D. Kan. May 7, 2019); *Jefferson v. Aramark Corr. Servs.*, Case No. 17-3161-SAC, 2017 WL 6557419, at *2 (D. Kan. Dec. 22, 2017); *Livingston v. Correct Care Sols.*, Case No. 07-3256-SAC, 2008 WL 1808340, at *1–2 (D. Kan. Apr. 17, 2008) (stating that "[a] policy is a formal statement by the private corporation" and "[a] custom is a persistent, well-settled practice of unconstitutional misconduct by employees that is known and approved by the corporation.").

The Court found that Plaintiff failed to state a claim against Centurion regarding her medical care; Plaintiff's allegation that the relevant policy is Centurion's substandard care fails to show the type of policy warranting imposition of liability; and she has failed to allege a formal

statement by the company or a persistent, well-settled practice. (Doc. 13, at 10–11.) Therefore, the Court dismissed Plaintiff's claims against Centurion. *Id*. at 11. Likewise, Plaintiff's medical claim in Count II is dismissed.

### 4. Count II – Sexual Assault

Plaintiff also raises an Eighth Amendment claim in Count II based on an alleged sexual assault occurring at TCF. The Tenth Circuit has "expressly acknowledged that an 'inmate has a constitutional right to be secure in her bodily integrity and free from attack by prison guards.'" *Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir. 1998) (citation omitted). A plaintiff's deprivations resulting from a sexual assault are "sufficiently serious to constitute a violation under the Eighth Amendment." *Id*.

Plaintiff claims that she was sexually harassed by CO Dietrick in August 2023, and then she was sexually assaulted by Dietrick on two separate occasions in October 2023. (Doc. 12, at 13.) Plaintiff alleges that she informed Defendants Chavez, Hook and Zmuda of the abuse through the emergency grievance procedures and they failed to act on the abuse and forced her to stay around her abuser. *Id*. at 14. These allegations are not addressed in the Report, and the Court finds that these claims survive screening.

Plaintiff also claims that she was subjected to retaliation after reporting the sexual assault. "[I]t is well established that an act in retaliation for the exercise of a constitutionally protected right is actionable under [42 U.S.C.] Section 1983 even if the act, when taken for a different reason, would have been proper." *Smith v. Maschner*, 899 F.2d 940, 947 (10th Cir. 1990) (citations omitted). The Tenth Circuit has held that:

> Government retaliation against a plaintiff for exercising his or her First Amendment rights may be shown by proving the following elements: (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a

person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.

*Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007).

However, an "inmate claiming retaliation must allege *specific facts* showing retaliation because of the exercise of the prisoner's constitutional rights." *Fogle v. Pierson*, 435 F.3d 1252, 1264 (10th Cir. 2006) (quotations and citations omitted).  Thus, for this type of claim, "it is imperative that plaintiff's pleading be factual and not conclusory.  Mere allegations of constitutional retaliation will not suffice." *Frazier v. Dubois*, 922 F.2d 560, 562 n. 1 (10th Cir. 1990).  "To prevail, a prisoner must show that the challenged actions would not have occurred 'but for' a retaliatory motive." *Baughman v. Saffle*, 24 F. App'x 845, 848 (10th Cir. 2001) (citing *Smith v. Maschner*, 899 F.2d 940, 949–50 (10th Cir. 1990); *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998)).

Plaintiff alleges that she made a PREA report, and her job as a porter was taken away in retaliation for reporting the sexual harassment and sexual assault alleged in Count II.  (Doc. 12, at 14.)  She alleges that she did not go to work on the day of the PREA investigation and was given a Disciplinary Report ("DR") for "Failure to go to work," even though she was told not to go because of the investigation.  *Id*.  Plaintiff alleges that the DR was dismissed and she was found not guilty. *Id*. at 15.

Valerie Watts, the KDOC's PREA Complaint Manager for TCF, provides in her declaration that after she received Plaintiff's PREA complaint on December 4, 2023, she met with Plaintiff that day for the Initial Retaliation Monitoring Meeting.  On December 13, 2023, Plaintiff received a DR for not reporting to work for her job as porter on December 12th and 13th. (Doc. 24–12, at 1.)  Plaintiff claims that the DR, which resulted in the loss of her job, was

in retaliation for filing the PREA.  Plaintiff was found not guilty due to her participating in a religious holiday on the first missed day and because she was given a directive to be placed in her cell until further notice for something regarding a PREA incident.  *Id.* at 4.

> Warden Hook's response to Plaintiff's grievance on the issue states that:

> > Your loss of your recreational porter job was part of a DR, regardless of if it was dismissed or not, you cannot grieve it using the grievance process/procedure.

> > I realize that you are not grieving the DR, you are stating that it was retaliation from UTM Hull-Viera as she fired you for being involved in Jewish practices of observing prayer times and Hanukkah.  You filed a change of religion form on 10/9/23, changing your religion to Christian/Protestant and there were no rituals of Hanukkah openly scheduled that you would have been participating in at the facility occurring the week of the 7th – 15th as you have stated in your grievance.

> > PREA Coordinator, Ms. Watts, has been meeting with you for retaliation monitoring for three months.  You met with Ms. Watts on 12/4/23 and 1/8/24 and 2/9/24, and after speaking to Ms. Watts, she stated that this was [sic] issue was investigated and determined not to be retaliation but that you were removed from your job based on identified risk as well as the safety and security of the residents, staff and the overall facility.

(Doc. 24–10, at 14.)

Plaintiff has not shown that the DR and the loss of her job would not have occurred 'but for' a retaliatory motive.  Plaintiff was found not guilty at the hearing, and the Warden's response indicates that Plaintiff was removed from her job based on identified risk, as well as safety and security concerns.  Plaintiff should respond to the Report and show good cause why her retaliation claim should not be dismissed for failure to state a claim.

### 5. Count II – Safety

Plaintiff also alleges in Count II that she has the right to be reasonably safe.  (Doc. 12, at 15.)  She claims that she is not attempting to dictate where she is housed, but she has the right to

be reasonably safe and "similarly situated." *Id*. She then claims Defendants disregarded an excessive risk of serious harm by housing her around "institutional violent offenders." *Id*. Plaintiff claims a Constitutional violation "[w]here prison officials place a prisoner in a situation of danger from others who are known to be aggressive and institutionally violent." *Id*. at 15–16. Plaintiff then argues that she is "not similarly situated as [she is] a class of one being treated differently" and that [t]his issue has lead [sic] to a serious disruption in everyday prison life as symptoms increase disturbing [her] functioning . . . [t]his amounts to an atypical situation." *Id*. at 16.

Plaintiff has failed to state a failure to protect claim. "Under the Eighth Amendment, prison officials have a duty to 'provide humane conditions of confinement,' including 'tak[ing] reasonable measures to guarantee the safety of . . . inmates.'" *Requena v. Roberts*, 893 F.3d 1195, 1214 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 800 (2019) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quotation marks omitted)). This duty includes "a duty to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (ellipsis and quotation marks omitted). To prevail on a failure to protect claim, a plaintiff must show: "(1) 'that the conditions of [her] incarceration present an objective substantial risk of serious harm' and (2) 'prison officials had subjective knowledge of the risk of harm,' '[i]n other words, an official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Requena*, 893 F.3d at 1214 (citation omitted).

"The unfortunate reality is that threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm." *Turner v. Okla. Cty. Bd. of Cty. Comm'rs*, 804 F. App'x 921, 926 (10th Cir. 2020) (unpublished) (citing *Marbury*

*v. Warden*, 936 F.3d 1227, 1236 (11th Cir. 2019) (per curiam) (internal quotation marks omitted); *Prater v. Dahm*, 89 F.3d 538, 541 (8th Cir. 1996) (same)). "[S]ubjective awareness of only *some* risk of harm to a prisoner is insufficient for a deliberate-indifference claim." *Id.* (citing *Marbury*, 936 F.3d at 1238). Rather, "officials must possess enough details about a threat to enable them to conclude that it presents a strong likelihood of injury, not a mere possibility." *Id.* (citing *Marbury*, 936 at 1236 (internal quotation marks omitted)).

As the Court found in the M&O, "Plaintiff alleges that she is housed around 'institutionally violent' inmates, but fails to allege that she relayed any specific threats to Defendants or that Defendants were aware of a strong likelihood of injury to her." (Doc. 13, at 5) (citing *Gray v. Sorrels*, 744 F. App'x 563, 571 (10th Cir. 2018) (unpublished) (finding allegations of failure to protect too conclusory to establish personal participation and failure to allege specific content of emails); *see also Leonard v. Lincoln Cty. Bd. of Comm'rs*, 790 F. App'x 891, 894 (10th Cir. 2019) (unpublished) (finding plaintiff's general request and grievance did not put jail officials on notice that he was at risk of being assaulted)).

Even though Plaintiff insists that this is a safety issue and she is not arguing about her housing assignment, she has not shown any threat toward her personally or any failure to protect her from other inmates housed near her. Instead, her argument is no different than an argument that she should be housed around non-violent inmates, which is an argument about her security classification and housing assignment. The Court held in the M&O that "Plaintiff has not shown that her assignment imposed any atypical and significant hardship in relation to the ordinary incidents of prison life." (Doc. 13, at 6.) Plaintiff does not have a constitutional right to dictate where she is housed, whether it is which facility or which classification within a facility. *See Schell v. Evans*, 550 F. App'x 553, 557 (10th Cir. 2013) (citing *Meachum*, 427 U.S. at 228–29;

*Cardoso v. Calbone*, 490 F.3d 1194, 1197–98 (10th Cir. 2007).  Moreover, prison officials are entitled to great deference in the internal operation and administration of the facility.  *See Bell v. Wolfish*, 441 U.S. 520, 547–48 (1979).  The Court dismissed any claim regarding Plaintiff's security classification and housing at TCF.  (Doc. 13, at 7.)

Plaintiff's allegations in Count II under "safety" then seem to pivot into an equal protection argument.  She alleges that she is "the only individual who is not a disciplinary issue that cannot participate in any programming, classes, dog program, or anything at all at the prison (TCF)."  *Id*. at 16.  Plaintiff alleges that there are male inmates who have the same charges and are non-disciplinary who have access to these programs and housing, and there are female inmates in the same comparison group but Plaintiff is treated differently in violation of equal protection.  *Id*.  Plaintiff does not identify any program or class that she sought to participate in at TCF and was denied.

To allege an equal protection violation, a plaintiff must state facts indicating that defendants treated him or her differently than other similarly situated individuals.  *See City of Cleburne v. Cleburne Living Ctr*., 473 U.S. 432, 439 (1985).  Plaintiff does not allege that she was treated differently on the basis of class membership. To proceed upon an equal protection claim as a "class-of-one plaintiff," there must be allegations that others similarly situated in every material respect were intentionally treated differently and that the government's action was irrational and abusive.  *Haik v. Salt Lake City Corp*., 567 F. App'x 621, 631–32 (10th Cir. 2014); *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1216 (10th Cir. 2011).  Plaintiff has failed to allege that the other inmates were similarly situated in every material respect.  *See Barney v. Pulsipher*, 143 F.3d 1299, 1312 (10th Cir. 1998) ("In order to assert a viable equal protection claim, plaintiffs must first make a threshold showing that they were treated differently from

others who were similarly situated to them.") (citation omitted).  Plaintiff should show good cause why her failure to protect and equal protection claims should not be dismissed.

### 6. Count III – Freedom of Religion

As Count III, Plaintiff alleges violations of her right to freely exercise her religion and an equal protection violation.  She alleges that she was told she could not check "Native American" and also attend church services "about God" because she would have to attend smudging instead. She claims she entered TCF as Jewish and was told they did not recognize Jewish and that no one at I/J cellhouse was listed as Jewish.  She alleges that male inmates are allowed to attend as many church services as they like, but she was forced to choose.

The Report acknowledges that: because Plaintiff was the only Jewish resident in her building at that time, there were no Jewish church services available; that they currently do not have any volunteers to lead Jewish services; and that per policy, in order to schedule a group service there must be 2 or more with approval from the Chaplain.

In *Williams v. Hansen*, "prison officials imposed a lockdown and modified operations, including an indefinite suspension of Native American religious services."  *Williams v. Hansen*, 5 F.4th 1129, 1131 (10th Cir. 2021).  "Despite this suspension, prison officials allowed Christian and Islamic groups to continue their religious services because outside volunteers could provide supervision."  *Id*. at 1131–32.  In addressing qualified immunity, the Tenth Circuit found that "[i]t was clearly established that the indefinite denial of any religious services would violate Mr. Williams's right to freely exercise his religious beliefs in the absence of a legitimate penological interest."  *Id*. at 1132.

The Tenth Circuit then addressed the duration of the suspension and found that:

> Though *Yellowbear* characterized the ban of a religious service as
> a substantial burden, the defendants compare their conduct to what

30

took place in *Gallagher v. Shelton*, 587 F.3d 1063 (10th Cir. 2009). In *Gallagher*, we concluded that isolated acts of negligence do not substantially burden the free exercise of religion. *Id.* at 1070. But this comparison fails based on differences in duration and intent.

First, the ban here lasted at least nine days and possibly longer. . . . By contrast, *Gallagher* addressed only 2 occasions of delays in accommodating requests for religious holidays and 1 incident involving contamination of kosher utensils. *Gallagher*, 587 F.3d at 1070.

Second, the court in *Gallagher* emphasized the unintentional nature of the disruption to religious observance. *Id.* Here, though, authorities allegedly acted intentionally by disallowing tobacco and suspending services. We've noted that our court couldn't locate opinions suggesting "that a conscious or intentional interference with [a prisoner's] right to free exercise, whether relatively brief or not, is consistent with the First Amendment." *Ralston v. Cannon*, 884 F.3d 1060, 1067 & n.8 (10th Cir. 2018); *see also id.* at 1067 n.8 (distinguishing opinions that found no violation because there wasn't adequate evidence of intent). Because Mr. Williams alleges intentional deprivation of any religious services, *Gallagher* does not help the defendants. Intentionally denying access to any religious services is clearly established as a substantial burden under *Yellowbear*.

The defendants point out that the ban in *Yellowbear* was apparently permanent, *see* 741 F.3d at 53, and the denial here was not. But we do not know how long the denial lasted. Defense counsel acknowledged that the complaint had alleged a denial that might have lasted as long as 30 days. Oral Argument at 6:10–6:18. In reality, the ban might have lasted even longer.[] And we must construe the amended complaint favorably to Mr. Williams. *Sanchez v. Hartley*, 810 F.3d 750, 754 (10th Cir. 2016). So for purposes of the motion to dismiss, we can assume that the ban lasted beyond a single month.

But even a single month would have sufficed, for *Makin v. Colorado Department of Corrections*, 183 F.3d 1205, 1215 (10th Cir. 1999) clearly established a substantial burden for a partial religious deprivation lasting only one month. In *Makin*, prison officials failed to provide meals to an inmate at appropriate times throughout the month of Ramadan. *Id.* at 1208–09. We held that the prison officials had diminished the plaintiff's spiritual experience, burdening his exercise of religion enough to violate the First Amendment. *Id.* at 1212–13. In stating this holding, we

> recognized that a "complete denial of the ability to observe a religious practice is not required to demonstrate an infringement." *Id.* at 1213.
>
> If a deprivation of appropriately timed meals for a month constitutes a substantial burden under the First Amendment, a complete ban on religious services for a month would also create a substantial burden. And here the prison officials unquestionably acted in a way that diminished Mr. Williams's spiritual experience.

*Id.* at 1134–35.

"To state a valid constitutional claim, a prisoner must allege facts showing that officials substantially burdened a sincerely held religious belief." *Id.* at 1133 (citing *Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007)). "If a substantial burden is shown, officials must identify a legitimate penological interest." *Id.* (citing *Kay*, 500 F.3d at 1218). "And if a legitimate penological interest exists, the court must determine the reasonableness of the conduct creating the burden." *Id.* (citing *Kay*, 500 F.3d at 1218–19). The Court finds that Plaintiff has alleged a sufficient burden to survive screening. Defendants will have an opportunity to respond regarding whether a penological interest exists and regarding the reasonableness of the conduct creating the burden. Plaintiff's First Amendment claim in Count III alleging a violation of the Free Exercise Clause survives screening.

To the extent Plaintiff raises an equal protection claim in Count III, the claim is subject to dismissal for failure to state a claim. Plaintiff argues that she was told that male inmates are allowed to attend as many church services as they like and with any religion. (Doc. 12, at 18.) TCF's Chaplain, Jesse Waller, denies having told Plaintiff that her religious freedoms were being limited by any person or entity at TCF and denies having told Plaintiff that male residents have any greater freedom to pursue religious interests than female residents. The Report states that all

residents have equal access and involvement in religious services regardless of their sex or gender.

The Report provides that residents are not able to choose more than one religion affiliation per IMPP 10–110D. The KDOC's Internal Management Policy & Procedure ("IMPP") 10–110D states that it applies "Department-Wide." (Doc. 24–15, at 1.) The IMPP refers to "residents" without a distinction between male and female inmates. Plaintiff has not alleged sufficient facts to show that female inmates were treated differently than male inmates. She should show good cause why her equal protection claim in Count III should not be dismissed for failure to state a claim.

### 7. Count IV – Retaliation

Plaintiff alleges retaliation as Count IV. Plaintiff alleges that she has been subjected to retaliation for filing her state habeas case and this § 1983 case. Plaintiff alleges that she received a letter on February 1, indicating she was being investigated for her tablet use and that the tablet would be revoked during the investigation. Plaintiff alleges that this was done in retaliation for her filing grievances and the PREA. She alleges that the DR she received did not have tablet suspension as part of the punishment, and her tablet use was suspended to keep her from filing electronic grievances. Plaintiff also alleges that after filing this § 1983 action, she has been subjected to lengthy room searches. She claims that a search on the day she filed this action lasted an hour, and another search on March 22, 2024, lasted three hours and ten minutes and included staff going through her legal box and reading information. Plaintiff was told that the officer was looking for a number. Plaintiff also alleges that her job as porter was taken away as a form of retaliation.

The Court has already addressed Plaintiff's claim of retaliation for filing a PREA report and the loss of her porter job, and found that the claim is subject to dismissal. Likewise, nothing related to Plaintiff's disciplinary proceedings regarding her tablet use suggests retaliation.

Plaintiff alleges that her disciplinary proceedings were retaliation for filing a state habeas action and this § 1983 action. (Doc. 12, at 20.) Plaintiff filed this § 1983 action on February 16, 2024, and filed her state habeas action on April 3, 2024. *See Stauch v. Kansas Dep't of Corr.*, Case No. 2024-CV-000254 (District Court of Shawnee County, Kansas) (filed April 3, 2024). Plaintiff's tablet was confiscated on February 1, 2024–*prior to* filing this § 1983 action and prior to filing her state habeas action. Plaintiff claims that on February 1, she was told that her state habeas was sent to the Federal District Court instead of the state e-file address. (Doc. 12, at 21.)

Plaintiff's tablet was confiscated when TCF's EAI became aware that she had sold a pair of her sweatpants on eBay through a third party for $200. The DR for the violation was issued on February 15, 2024. The Court found in the MOSC that "[i]f she was using the tablet to process online orders, this could be the rationale for the 10-day restriction on use of the tablet, instead of an attempt to prevent her from filing grievances on the tablet." (Doc. 11, at 22.) The Report shows that her tablet was removed from her possession after she was found abusing the electronic messaging system and selling her clothing via a third party on eBay. Plaintiff regained electronic access to her tablet on May 1, 2024. (Doc. 24–5, at 2.)

The Report also alleges that Plaintiff has not filed a grievance about lengthy room searches and the only lengthy cell search potentially applicable would not have been a search, but a pack-out of Plaintiff's property when she was placed on Crisis Level. Plaintiff has failed to state a retaliation claim based on her disciplinary proceedings regarding use of the tablet or lengthy cell searches. Plaintiff has not shown that the actions would not have occurred 'but for'

a retaliatory motive.  Plaintiff should show good cause why this claim should not be dismissed for failure to state a claim.[6]

In her motion to reconsider (addressed below) Plaintiff asks the Court to also consider her transfer to KDOC from CDOC as a form of retaliation.  She claims that her transfer was in retaliation for filing grievances in Colorado.  In her Motion for Preliminary Injunction (Doc. 9) Plaintiff alleged that she made an administrative complaint to the Warden of her Colorado prison, "expressing the need to be restricted to the unit for at least 6 months or so due to the high publicity surrounding [her] trial in 2023."  (Doc. 9, at 2.)  Plaintiff also argued that she sought to be placed on RTU (Restricted to the Unit) "because [she] had the highest profile case in the state at that time."  *Id*.  Plaintiff alleges that the Colorado facility "recognized the need for safety and mental health but then refused to place [Plaintiff] as 'RTU' for an extended period" and "[i]nstead . . . took adverse action and transferred [Plaintiff] to Kansas."  *Id*.  Plaintiff alleges that the transfer was retaliatory because the Colorado Warden knew a violation of her rights was inevitable.  *Id*.  The Court addressed this argument in denying Plaintiff's request for injunctive relief.  *See* Doc. 11, at 24–27.  The Court found that Plaintiff failed to demonstrate a likelihood of success on the merits.  *Id*. at 27.

---

[6] Plaintiff alleges that the hearing officer was biased and makes other claims regarding the disciplinary proceedings. Challenges to prison disciplinary proceedings must be raised in a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2241.  *Abdulhaseeb v. Ward*, 173 F. App'x 658, 659 n.1 (10th Cir. 2006) (citing *McIntosh v. United States Parole Comm'n*, 115 F.3d 809, 811 (10th Cir. 1997) (petitions under § 2241 are used to attack the execution of a sentence, including the deprivation of good-time credits and other prison disciplinary matters);  Section 1983 is not applicable to "challenges to punishments imposed as a result of prison disciplinary infractions," unless the disciplinary conviction has already been invalidated.  *Cardoso v. Calbone*, 490 F.3d 1194, 1199 (10th Cir. 2007). The Supreme Court has made clear that "a state prisoner's claim for damages is not cognizable under 42 U.S.C. § 1983 if 'a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence,' unless the prisoner can demonstrate that the conviction or sentence has previously been invalidated."  *Edwards v. Balisok*, 520 U.S. 641, 643 (1997) (quoting *Heck v. Humphrey*, 512 U.S. 477, 487 (1994)).  This rule applies not only when the prisoner challenges his conviction but also when he challenges punishments imposed as a result of prison disciplinary infractions.  *Balisok*, 520 U.S. at 648.

As set forth above, an "inmate claiming retaliation must allege *specific facts* showing retaliation because of the exercise of the prisoner's constitutional rights." *Fogle v. Pierson*, 435 F.3d 1252, 1264 (10th Cir. 2006) (quotations and citations omitted).  Thus, for this type of claim, "it is imperative that plaintiff's pleading be factual and not conclusory.  Mere allegations of constitutional retaliation will not suffice." *Frazier v. Dubois*, 922 F.2d 560, 562 n. 1 (10th Cir. 1990).  "To prevail, a prisoner must show that the challenged actions would not have occurred 'but for' a retaliatory motive." *Baughman v. Saffle*, 24 F. App'x 845, 848 (10th Cir. 2001) (citing *Smith v. Maschner*, 899 F.2d 940, 949–50 (10th Cir. 1990); *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998)).

Plaintiff's conclusory allegations that her transfer from Colorado to Kansas was retaliatory fails to state a claim.  She was transferred after expressing concerns for her safety due to her high-profile criminal case.  Plaintiff has failed to show that the transfer would not have occurred but for a retaliatory motive.  Plaintiff should show good cause why her retaliation claim based on her transfer to Kansas should not be dismissed for failure to state a claim.

## IV.  Motions

### 1.  Motion to Reconsider – Equal Protection (Doc. 18)

Plaintiff has filed a motion to reconsider her retaliation claim based on her transfer to KDOC custody.  (Doc. 18, at 1.)  Plaintiff alleges that her transfer was in retaliation for filing grievances in Colorado for violations of her religious rights.  *Id*.  Plaintiff then alleges that Defendant Larry Turner, CDOC Designee, "knew about the type of abuse at TCF and how TCF did not have those religious rights (Jewish)." *Id*.  Plaintiff also alleges that her transfer to the KDOC was a form of punishment "because KDOC is known for abuse to residents, several claims of sexual harassment and assault, non-compliance for PREA reporting, non-compliance

of medical and records by Centurion, reports of records of building being contaminated and improper ventilation, no access to out of state courts, etc." *Id*. at 2.

It is not clear what Plaintiff is asking the Court to reconsider.  At first, she claims she wants the Court to "reconsider the retaliation claim under the First Amendment," arguing that the Court overlooked her transfer as a basis for retaliation. *Id*. at 1.  The Court has considered this argument in its MOSC denying Plaintiff's motion for a preliminary injunction and again in this Memorandum and Order as set forth above.

Then Plaintiff argues that her due process issue was not about housing or classification, but rather is based on an equal protection violation under a class of one theory. *Id*. at 2.  Plaintiff claims that she has "demonstrated how similarly situated inmates were treated more favorably without any reasonable penological interest." *Id*.  Plaintiff then claims that a list of similarly situated inmates "could be provided during discovery instead of with the petition . . . to keep those inmates from being harassed and threatened by TCF during the early stages of the 1983 Petition." *Id*.

Plaintiff has not stated a viable equal protection claim.  She does not give any indication of how other similarly situated inmates were treated more favorably.  The Court notes that she attaches an exhibit to her Motion to Amend (Doc. 19) purporting to be a list of similarly situated residents for her "class of one theory."  (Doc. 19–1, at 7–8.)  She then lists seven TCF inmates without indicating how they are similarly situated.  For three of the inmates, she claims they are "considered a lifer," one she claims "sentence (Lifer)," one she claims has "similar charges," and nothing is listed for the other two inmates. *Id*.  She seems to suggest that the referenced inmates received a similar criminal sentence.  Plaintiff has not pointed to another inmate with a high-profile case that was transferred to KDOC custody from Colorado and that is similarly situated

"in every material respect."

Plaintiff reiterates that she is not contesting her housing or classification.  (Doc. 18, at 3.)
Plaintiff asks the Court "to reconsider the similarly-situated due process section and the
retaliation claim."  *Id*. at 3–4.  The Court grants the motion to the extent that the Court has
considered those claims and arguments in this Memorandum and Order.  However, those claims
are subject to dismissal as set forth in this Memorandum and Order.

### 2.  Motion to Reconsider Preliminary Injunction (Doc. 20)

Plaintiff has also filed a motion to reconsider granting a preliminary injunction, arguing
again that her transfer to TCF was retaliatory because Defendant Turner "knew a violation of
[Plaintiff's] rights [was] inevitable" and "would eliminate several Constitutional rights and
Plaintiff would be placed in a higher custody level around institutional violent offenders."
(Doc. 20, at 2.)  Plaintiff argues that she will suffer irreparable harm if she remains in KDOC
custody.  *Id*.  As support for her claim that she will suffer continued physical and mental pain
and suffering if she remains in KDOC custody, Plaintiff sets forth some of her claims in this
case, including: inadequate medical care; denial of court access to the Colorado courts; continued
religious rights violations; mail tampering and denial of access to counsel; injuries to Plaintiff's
right ear; developed respiratory issues from toxins, mold, and improper ventilation; and non-
nutritional food; and unsanitary conditions.  *Id*. at 3.

Plaintiff asks the Court to reconsider its denial of her request for a preliminary injunction.
In her original request, Plaintiff sought injunctive relief in the form of an order releasing her
from KDOC custody and returning her to Colorado.  (Doc. 9, at 1.)

To obtain a preliminary injunction, the moving party must demonstrate four things: (1) a
likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm

in the absence of preliminary relief; (3) that the balance of the equities tip in the movant's favor; and (4) that the injunction is in the public interest. *Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010). "[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004).

In denying Plaintiff's original request, the Court found that Plaintiff failed to set forth a likelihood of success on the merits, noting that her Complaint was subject to dismissal. (Doc. 11, at 25.)  The Court also found that:

> Her claims regarding violations of the Interstate Corrections Compact are not actionable under § 1983. Plaintiff has provided no authority for this Court to order her transfer back to Colorado. *See Rivers v. King*, 23 F. App'x 905, 908 n.4 (10th Cir. 2001) ("[T]his court has no jurisdiction to mandamus state officials because the statutory power to grant such writs is provided only against federal officials."); *see also Lynn v. Simmons*, 32 Kan. App. 2d 974, 981 (2003) ("We conclude that the act of transferring an inmate to, or returning an inmate from, an interstate prison is not a legally specified duty that is properly the subject of a mandamus action . . . [and plaintiff] had no protected liberty interest to remain in a Kansas prison.").

*Id*.

The Court also found that Plaintiff's allegations do not establish that injury is certain and not theoretical, or more than merely feared as liable to occur in the future.  "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (internal quotation marks omitted).  A preliminary injunction is only appropriate "to prevent existing or presently threatening injuries. One will not be granted against something merely feared as liable to occur at some indefinite time in the future." *State of Connecticut v. Commonwealth of Massachusetts*, 282 U.S. 660, 674 (1931).

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A preliminary injunction is appropriate only when the movant's right to relief is clear and unequivocal. *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005). Moreover, a federal court considering a motion for preliminary injunctive relief affecting the conditions of a prisoner's confinement must give "substantial weight to any adverse impact on public safety" and on prison operation. 18 U.S.C. § 3626(a)(2). Finally, a mandatory preliminary injunction, such as the one sought by Plaintiff, which requires the non-moving party to take affirmative action, is disfavored and therefore requires the moving party to make a heightened showing of the four factors above. *Little*, 607 F.3d at 1251. Because preliminary injunctions and TRO's are drastic remedies—"the exception rather than the rule—plaintiffs must show that they are clearly and unequivocally entitled to relief." *Adrian v. Westar Energy, Inc.*, No. 11-1265-KHV, 2011 WL 6026148, at *3 (D. Kan. 2011) (citations omitted).

Nothing in Plaintiff's motion warrants reconsideration of the Court's order denying her request for a preliminary injunction. Local Rule 7.3 provides that "[e]xcept for motions under Fed. R. Civ. P. 59(e) or 60, parties seeking reconsideration of a court order must file a motion within 14 days after the order is served unless the court extends the time" and "[a] motion to reconsider must be based on: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error or prevent manifest injustice." D. Kan. Rule 7.3. Plaintiff has failed to present any of the grounds warranting reconsideration as set forth in Local Rule 7.3. Plaintiff's motion for reconsideration is denied.

**IT IS THEREFORE ORDERED BY THE COURT** Plaintiff's Motion to Reconsider (Doc. 18) is **granted** to the extent that the Court has considered those claims and arguments in

this Memorandum and Order.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Reconsider Preliminary Injunction (Doc. 20) is **denied.**

**IT IS FURTHER ORDERED** that the following claims survive screening: Plaintiff's Eighth Amendment claim in Count II based on sexual assault and her corresponding claim that staff failed to protect her from her abuser; and Plaintiff's First Amendment claim in Count III alleging a violation of the Free Exercise Clause. All other remaining claims are subject to dismissal.

**IT IS FURTHER ORDERED** that Plaintiff shall have until **August 29, 2024**, in which to respond to the Report at Doc. 24 and to show good cause why her remaining claims should not be dismissed for the reasons set forth in this Memorandum and Order.

**IT IS SO ORDERED**.

**Dated July 29, 2024, in Kansas City, Kansas.**

<u>**S/  John W. Lungstrum**</u>
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**