IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

LETECIA STAUCH,

      **Plaintiff,**

v.                                                            CASE NO. 24-3027-JWL

JEFF ZMUDA, et al.,

      **Defendants.**

## MEMORANDUM AND ORDER

Plaintiff brings this pro se civil rights action under 42 U.S.C. § 1983. Plaintiff is in custody at the Topeka Correctional Facility in Topeka, Kansas ("TCF"). Plaintiff is a Colorado Department of Corrections' ("CDOC") prisoner housed at TCF through the Interstate Corrections Compact. The Court granted Plaintiff leave to proceed in forma pauperis. On March 15, 2024, the Court entered a Memorandum and Order to Show Cause (Doc. 11) ("MOSC"), ordering Plaintiff to show good cause why her Complaint should not be dismissed for the reasons set forth in the MOSC, or to file an amended complaint to cure all the deficiencies. Plaintiff filed an Amended Complaint (Doc. 12), and on April 29, 2024, the Court entered a Memorandum and Order (Doc. 13) ("M&O") dismissing Plaintiff's claims regarding her security classification and housing assignment at TCF, and dismissing Plaintiff's claims against Valerie Watts and Centurion.

The Court found in the M&O that the proper processing of Plaintiff's remaining claims could not be achieved without additional information from appropriate Kansas Department of Corrections ("KDOC") officials. *See Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978); *see also Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991). Accordingly, the Court ordered the KDOC

officials to prepare and file a *Martinez* Report regarding the remaining claims. The *Martinez* Report (Doc. 24) (the "Report") was filed, and the Court entered a Memorandum and Order (Doc. 27) ("M&O II") finding that the following claims survive screening: Plaintiff's Eighth Amendment claim in Count II based on sexual assault and her corresponding claim that staff failed to protect her from her abuser; and Plaintiff's First Amendment claim in Count III alleging a violation of the Free Exercise Clause. The Court found that all other remaining claims were subject to dismissal and ordered Plaintiff to show good cause why those claims should not be dismissed. This matter is before the Court on Plaintiff's Response (Doc. 28).

## I. Nature of the Matter Before the Court

Plaintiff's allegations in her Amended Complaint are set forth in detail in the M&O. In summary, she raises claims regarding the denial of court access, Eighth Amendment violations based on her conditions of confinement at TCF, claims regarding her freedom to practice her religion at TCF, and retaliation. The Court set forth in detail the Report's findings in the Court's M&O II. The Court will not address the claims that were previously dismissed or the claims that the Court found passed screening.

Plaintiff names the following remaining defendants: Jeff Zmuda, KDOC Secretary of Corrections; Darcie Holthaus, KDOC Secretary of Corrections Designee and Interstate Corrections Compact Coordinator; Donna Hook, TCF Warden; (fnu) Dietrick, TCF Correctional Officer ("CO"); Dalton Hartpence, TCF Administration; Larry Turner, CDOC Designee and Interstate Corrections Office; Holly Chavez, TCF Facility Service Administrator; and (fnu) Van Dyke, 1st Sgt/Disciplinary Administrator at TCF. Plaintiff seeks injunctive relief to prevent continued violations and compensatory damages. (Doc. 12, at 6.)

## II. DISCUSSION

### 1. Count I – Court Access

#### A. Phone Access to Attorney

Plaintiff alleges in Count I of her Amended Complaint that she was denied court access when she was denied phone access to her attorney. Plaintiff alleges that from August 2023 to December 2023, she was denied phone access to her attorney regarding her direct criminal appeal. (Doc. 12, at 7.)

Plaintiff has not sufficiently alleged that she was denied access to her attorneys for her criminal appeal in Colorado. Although Plaintiff claims that she was denied the ability to add her attorney to her Allowed Calling List from August to December of 2023, the Report shows that Plaintiff did not follow the proper procedures for adding her attorney to the call list, and when her attorney contacted the KDOC and conveyed his interest in having a confidential call with Plaintiff, he was provided the registration form. He completed it on the same day, and it was approved the following day. The Report provides that prior to this, no evidence has been found to support either party attempting to place a call to the other.

In her response, Plaintiff does not address the issue regarding phone access to her attorney or adding her attorney to the phone list. Plaintiff's claim regarding phone access to her attorney is dismissed for failure to state a claim.

#### B. Law Library

Plaintiff continues to claim that shortcomings in TCF's law library hindered her ability to pursue litigation in Colorado. (Doc. 12, at 8.) Plaintiff claims she does not have access to courts in Colorado. *Id*. In her response, Plaintiff alleges that she "did not have access to Colorado courts, caselaw, any resources outside of Kansas, nor the statutes." (Doc. 28, at 1.) Then

Plaintiff states that she needs "more than statutes." *Id*. Plaintiff also attaches her grievance, in which she claims that she "need[s] more than the Colorado statutes [and] need[s] access to the courts." (Doc. 28–1, at 4.)

The Court advised Plaintiff in the MOSC that Plaintiff's criminal appeal in Colorado is not accessible because it is "suppressed." (Doc. 11, at 11.) The Court was also unable to access her case online, and could only view the information on the Case Information document. *Id*. The document, which was attached to the MOSC, provides that: "This case is suppressed and available only to case parties." *Id*. The Court found in the MOSC that it appears that Plaintiff would face the same challenge trying to access the information online, including through Lexis, at any facility. *Id*. Because the case information document provides that the case is available only to parties, the Court advised Plaintiff to contact the appellate court or her attorney to determine how to gain access. *Id*.

The Court found in the MOSC that although Plaintiff alleged in her Complaint that she was representing herself in her criminal appeal, the case information document attached to the MOSC stated that she was represented by Eric A. Samler and Hollis Ann Whitson. *Id*. The Court found that providing legal counsel is a constitutionally acceptable alternative to a prisoner's demand to access a law library. *Id*. at 12.

In her Amended Complaint, Plaintiff states that she "understand[s] that the sending state provides a majority of resources." (Doc. 12, at 7.) The Court found in the MOSC that although the right to court access "is not diminished when a prisoner is transferred out of state," . . . "[t]he *sending* state bears the burden of providing the required state legal materials." (Doc. 11, at 11) (citing *Garcia v. Hoover*, 161 F.3d 17, 1998 WL 614673, at *1 (10th Cir. 1998) (emphasis added).

In *Clayton v. Tansy*, the plaintiff, a state inmate, was transferred from Oklahoma to New Mexico pursuant to the Interstate Corrections Compact. *Clayton v. Tansy*, 26 F.3d 980, 981 (10th Cir. 1993). Plaintiff sued the New Mexico Warden seeking access to Oklahoma law, which the New Mexico prison did not have. *Id*. The Tenth Circuit held that the sending state was responsible for providing the materials, and that officials from the sending state "would not have been subject to service of process." *Id*. at 982 (adopting "the present consensus that it is the sending state which bears the burden of providing the required state legal materials") (citing Fed. R. Civ. P. 4(f)). The Tenth Circuit held that if the plaintiff has a valid § 1983 claim, it "should be pursued against the proper defendant in a court of proper venue." *Id*.

Plaintiff in this case has named as a defendant Larry Turner, CDOC Designee and Interstate Corrections Office. As noted in *Clayton*, this claim should be brought in a court of proper venue. Plaintiff has in fact filed an action asserting a court access claim against Larry Turner in the U.S. District Court in Colorado. *See Stauch v. Turner*, Case No. 24-cv-02238-RTG (D. Colo.). Plaintiff's court access claim based on the law library in the instant case is dismissed.

### C.  Legal Mail

Plaintiff also alleges in Count II that her legal mail to her attorney was confiscated. (Doc. 12, at 7.) She claims the her mail was tampered with from September 2023 until the time she filed her Amended Complaint. Plaintiff claims that she was forced to file a request to represent herself in her direct criminal appeal. *Id*. She also claims that her legal mail was tampered with when the court presiding over her Colorado conditions of confinement action. Plaintiff also alleges that her mail to her Colorado attorneys "has been confiscated by Dalton Hartpence even in the presence of a SSGT." *Id*.

In her response, Plaintiff alleges that the list that the KDOC provided includes mail that was actually sent or received, and her claim relates to several letters that were sent out but never received. (Doc. 28, at 2.) Plaintiff claims she is missing letters from attorneys, the Shawnee County Court, and from the Colorado Courts.

In dismissing her civil rights case against El Paso County, the U.S. District Court in Colorado stated that:

> The Court received a Letter from Plaintiff on March 4, 2024. Dkt. 60. The Letter explained that Plaintiff was then incarcerated in Kansas and did not receive the Court's second OSC until February 28, 2024—one day before her response deadline. *Id*. While she explained her difficulties receiving mail, importantly she acknowledged receiving the OSC but did not respond to it as ordered. *See id*.
>
> On June 6, 2024, the Court again mailed the second OSC to Plaintiff at her place of incarceration in Kansas. Dkt. 61. In its June Order, the Court noted that the second OSC had been returned to the Court as undeliverable, but that Plaintiff had updated her address via her March letter. *Id*. The Court therefore re-sent the second OSC to Plaintiff at the updated address and ordered her to respond to the OSC by July 8, 2024. Dkts. 61, 64. On June 25, 2024, the postal service again returned the Court's Order and second OSC because it was undeliverable to Plaintiff.

*Stauch v. El Paso Cty.*, 2024 WL 3722959, at *2 (D. Colo. Aug. 8, 2024).

The Court finds that Plaintiff's claim regarding her legal mail in Count III survives screening.

**2. Count II – Conditions at TCF**

As Count II, Plaintiff alleges cruel and unusual punishment and deliberate indifference to her health and safety. Plaintiff bases this claim on the following conditions: exposure to toxins from sewage leaks that cause waste to return to inmates' cells about two times a week;

6

inoperable sinks that lack hot water for sanitation; obvious signs of mold leading to medical issues; exposure to contaminated water on January 14, 2024, when Defendants failed to advise inmates about a warning from the city of Topeka for 24 hours; inadequate ventilation adding to the exposure to toxins; leaking windows that allow rain, wind, and vermin to enter through the windows; getting cleaning supplies is often an issue; and food is not prepared under clean conditions, is generally cold, and does not follow nutritional guidelines.  Plaintiff alleges that the conditions have caused breathing issues, extreme headaches, dizziness, nausea, daily nose bleeds, and diminished lung capacity.

      The Court noted in the M&O II that the Report shows that no sewage backups have been observed in any of TCF's cells, including the 10 cells in which Plaintiff has resided; when there is a backup reported for the showers, maintenance personnel try to immediately respond and block off traffic to the area; and TCF is in the process of upgrading its solid waste sewer system to address this issue and it is expected to be completed in 2025.  Plaintiff does not specify an instance where raw sewage was actually present in *her* cell, and mentions exposure to fumes.  She mentions sewage leaks "that causes [sic] the waste to return to *our cells* including other inmates['] feces, waste, etc., causing me to breathe in these fumes including gray water." (Doc. 12, at 9) (emphasis added).  She also mentions sewage leaks "through rooms" and "the pit" causing "backups and toxins overflowed into our rooms at an increasing rate" and "the issues with toxins and exposure to other feces has continued." *Id*. at 9–10.  She then states that "[i]t is estimated that it backs up and overflows in our rooms twice a week." *Id*. at 10.  She adds that "ICH does not have adequate ventilation which adds to the exposure" and that she has been "expos[ed] to toxic substances, sewer gas." *Id*. at 10, 12.  Plaintiff does not allege that staff

failed to timely remedy any plumbing backups. Plaintiff fails to address sewage leaks or sewage toxins in her response. *See* Doc. 28.

Regarding cleaning supplies, Plaintiff states that access to cleaning supplies "is often an issue because SSGTs on duty consistently yell about getting them and threaten to take them away daily." (Doc. 12, at 10.) Plaintiff does not suggest that she has no access to cleaning supplies. Plaintiff's Unit Team Manager, Linda Hull-Viera, does not recall a single instance in which Plaintiff was denied the ability to retrieve cleaning products or to be provided cleaning products by security personnel. Plaintiff does not address cleaning supplies in her response. *See* Doc. 28.

Plaintiff also makes the bald conclusion that ICH does not have adequate ventilation. (Doc. 12, at 10.) The Report states that TCF has contracted with P1 Groupe, Inc., which maintains air quality and ventilation systems for the facility, and the Maintenance Department has not found inadequate ventilation in Plaintiff's current or previous cells or in the I cellhouse generally. In her response, Plaintiff does not address ventilation specifically, but questions the qualifications of the individuals performing testing. (Doc. 28, at 4.)

Plaintiff claims that "[w]indows leak water and winds are of extreme temps in winter at ICH . . . [v]ermin also enters into some windows." (Doc. 12, at 11.) Plaintiff does not give any specifics as to when and where she observed leaking windows or vermin entering through unspecified windows. The Report states that no evidence of window leaks, mold, or vermin have been found by TCF's Maintenance Department in any of the cells that Plaintiff has resided; Plaintiff's claim that her cell experiences extreme temperature changes is unsubstantiated and has not been reported to TCF's Maintenance Department; and since Plaintiff has lived at TCF, not one Health and Sanitation Inspection Report has found a window opening that would allow a

8

bug/rodent infestation in ICH.  In her response, Plaintiff claims that "[a]t no time has anyone checked the windows on any cell that [she has] lived in nor was a report provided by qualified individuals to verify leaks, improper ventilation, or how we cannot see out our windows." (Doc. 28, at 4.)

Regarding mold, Plaintiff makes an unsupported allegation that "obvious signs of mold" have led to health issues, without indicating where or when she observed mold at TCF. (Doc. 21, at 10.)  A "bare allegation of [the presence of] mold . . . does not create a reasonable inference regarding the sort of threat to [a plaintiff's] mental or physical well being which is necessary for violation of the Eighth Amendment." *Cox v. Grady Cty. Detention Center*, 2008 WL 1925052, at *3–4 (W.D. Okla. April 29, 2008) (citing *Dittmeyer v. Whetsel*, 91 F. App'x 111 (10th Cir. Feb. 11, 2004)).  The Report shows that the only document in which Plaintiff mentions mold is in a grievance that claims inadequate medical care from a Centurion nurse; Plaintiff did not file a grievance or maintenance request regarding any suspected mold during her time at TCF; and TCF's Maintenance Department investigates all claims of mold and has not identified any species of mold in Plaintiff's current or previous cells.

In her response, Plaintiff addresses her claims regarding mold, toxins, and ventilation, by attaching statements from other inmates and by stating that "personal injury can be showed [sic] during discovery."  (Doc. 28, at 4.)  Plaintiff alleges that no one has tested any of the cells she has lived in "nor were there any statements saying that." *Id*.  She also argues that the Report focused on cells but did not mention any common areas—the cafeteria, the law library, etc. *Id*.

Plaintiff claims that "sinks are inoperable without hot water for sanitation."  (Doc. 12, at 9.)  The Report shows that TCF heats its water with older water heaters which sometimes take up to a minute to produce heated water in cold weather.  Hot water is available in all TCF sinks and

9

showers, though it may take a few seconds to become available. The Report provides that at no point have any of Plaintiff's current or prior cells been without access to heated water; and since August 2023, hot water temperatures have been confirmed to range from 100 degrees Fahrenheit to 120 degrees Fahrenheit for each ICH inspection. In her response, Plaintiff states that "[h]ot water never works in our cells nor has anyone checked any cells that [she has] lived in." (Doc. 28, at 4.)

As for the day of the water advisory, Plaintiff claims that they "were only given two bottles of water in the morning and two at night." (Doc. 12, at 10.) The Report states that the KDHE's water advisory on January 14, 2024, was specifically directed at the Metro Topeka Airport Authority and Shawnee County Rural Water District 1C and out of an abundance of caution, steps were taken to prevent any risk to resident health. To ensure each resident was aware of the advisory, including residents that did not have tablet access, unit teams followed up the electronic notice with a verbal notice to their respective residents, maintenance staff also posted warnings on all facility water fountains, the facility shut off its water supply, and residents were issued bottles of water. Plaintiff has acknowledged that she received the bottled water and fails to allege that any delay in receiving notice of the water advisory was the result of deliberate indifference.

In her response, Plaintiff argues that no advisory was posted because it was a weekend and the Unit Team was not at TCF, and no other employees posted an advisory. (Doc. 28, at 3.) Plaintiff attaches statements from other inmates in Exhibits 4, 5, and 6. Plaintiff refers to Exhibit 7 to show she grieved the issue. *Id*. The statements from other inmates indicate that the advisory was on the news and that is how inmates became aware of it, no signs were posted and no announcement was made, and at around 9:00 pm officers came around and gave each resident

10

two bottles of water. (Doc. 28–1, at 6–10.) One of the inmates states that when she told her floor officer about the boil advisory he was unaware of it. *Id*. at 8. That inmate claims the advisory was on the news at 12:00pm. *Id*.

Plaintiff also claims that "food is not prepared under clean conditions and food is generally cold and does not follow nutritional guidelines." (Doc. 12, at 11.) The Report provides that TCF contracts with Aramark, Inc. for resident food services; Aramark has 2 full-time nutritionists that ensure meals are nutritionally compliant with state and federal standards; and while TCF's kitchen is being renovated, meals are being prepared in a mobile facility on TCF grounds and placed in portable food warmers and distributed as quickly as possible. The warmers are sufficient to keep meals warm until they reach the resident and meals are prepared in a sanitary manner and with the same care as if they were being prepared in the facility kitchen. The Report acknowledges that food is sometimes cold and a temporary result of TCF's kitchen renovations. (Doc. 24, at 13.)

Again, Plaintiff fails to refer to any specific instances or to give any details as to why she believes the food is not prepared under clean conditions or why it does not meet nutritional guidelines. She also fails to give examples of when or how often food is served cold. Similar allegations regarding cold food have been found to be insufficient to show a constitutional violation. *See Redick v. Coy*, 2022 WL 1026892, at *3 (D. Kan. 2022) (plaintiff failed to show that hair in food resulted from deliberate indifference and stating that "[c]ourts have found similar allegations insufficient to establish the violation of a constitutional right") (citing *see, e.g., Green v. Atkinson*, 623 F.3d 278, 281 (5th Cir. 2010) ("A single incident of food poisoning or finding a foreign object in food does not constitute a violation of the constitutional rights of the prisoner affected."); *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992) (ruling that

presence of foreign objects in food was insufficient to prove deliberate indifference); *Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) ("The fact that [prison] food occasionally contains foreign objects or sometimes is served cold, while unpleasant, does not amount to a constitutional deprivation."); *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993) (same); *Ockert v. Beyer*, No. 10–3058–SAC, 2010 WL 5067062 at *2 (D. Kan. Dec. 7, 2010) (finding that a single incident where hair was found in food failed to give rise to a constitutional violation)).

In her response, Plaintiff realleges her claims that the food is sometimes undercooked or cold and is below the calorie amount listed in KDOC policy and "Federal Standards for FDA." (Doc. 28, at 5.) Plaintiff also makes a bald conclusion that "[f]ood is prepared in unclean/non-sanitary conditions." *Id*. Plaintiff includes a sentence providing: "Mold and improper ventilation in the cafeteria and where food is prepared." *Id*.

The Court found in the M&O II that Plaintiff fails to give specific instances or examples to support most of her claims, and fails to show that any defendant was deliberately indifferent to her health or safety with regard to the conditions set forth above. The Court granted Plaintiff an opportunity to respond to the Report and to show good cause why her claims regarding these conditions at TCF should not be dismissed for failure to state a claim. Plaintiff either failed to respond regarding certain conditions, or responded with bald conclusions that lack any specific factual support. A pro se litigant's "conclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555

(2007) (citation omitted). The court "will not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173–74 (10th Cir. 1997) (citation omitted).

Plaintiff has failed to show good cause why her claims in Count II regarding her conditions of confinement at TCF should not be dismissed for failure to state a claim.

### 3. Count II – Medical Care

Plaintiff also alleges deliberate indifference regarding her medical care in Count II. She claims that there is "an increasing risk that [her] hand will never be restored to its full usefulness." (Doc. 12, at 12.) Plaintiff alleges that her right hand was injured by staff and she was told by medical that she could not receive any treatment beyond talking to the doctor in January 2024. *Id*. at 12–13. Plaintiff alleges that she has "potential permanent nerve damage in [her] right hand." *Id*. at 13.

The Court found in the M&O that Plaintiff failed to show that a named defendant disregarded an excessive risk to her health or safety or that they were both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and also drew the inference. (Doc. 13, at 10.) The Court noted that the only healthcare provider Plaintiff names in her Amended Complaint is Centurion, and found that Plaintiff's allegation that the relevant policy is Centurion's substandard care fails to show the type of policy warranting imposition of liability. (Doc. 13, at 10–11.) She has failed to allege a formal statement by the company or a persistent, well-settled practice. Therefore, the Court dismissed Plaintiff's claims against Centurion. *Id*. at 11. The Court found in the M&O II that Plaintiff's medical claim in Count II is likewise dismissed. Plaintiff does not address her medical care in her response. *See* Doc. 28.

### 4. Count II – Retaliation

Plaintiff alleges that she made a PREA report, and her job as a porter was taken away in retaliation for reporting the sexual harassment and sexual assault alleged in Count II. (Doc. 12, at 14.) She also claims that she received a Disciplinary Report ("DR") for failing to go to work on the day of her PREA investigation. *Id*.

The Court found in the M&O II that Plaintiff has not shown that the DR and the loss of her job would not have occurred 'but for' a retaliatory motive. Plaintiff was found not guilty at her disciplinary hearing, and the Warden's response indicates that Plaintiff was removed from her job based on identified risk, as well as safety and security concerns. The Court directed Plaintiff to respond to the Report and to show good cause why her retaliation claim should not be dismissed for failure to state a claim. Plaintiff does not address her retaliation claim in her response. *See* Doc. 28. Plaintiff's retaliation claim in Count II is dismissed for failure to state a claim.

### 5. Count II – Safety

Plaintiff also alleges in Count II that she has the right to be reasonably safe. (Doc. 12, at 15.) She claims that she is not attempting to dictate where she is housed, but she has the right to be reasonably safe and "similarly situated." *Id*. She then claims Defendants disregarded an excessive risk of serious harm by housing her around "institutional violent offenders." *Id*. Plaintiff claims a constitutional violation "[w]here prison officials place a prisoner in a situation of danger from others who are known to be aggressive and institutionally violent." *Id*. at 15–16. Plaintiff then argues that she is "not similarly situated as [she is] a class of one being treated differently" and that "[t]his issue has lead [sic] to a serious disruption in everyday prison life as symptoms increase disturbing [her] functioning . . . [t]his amounts to an atypical situation." *Id*.

14

at 16.

The Court found in the M&O II that Plaintiff failed to state a failure to protect claim based on her housing assignment. As the Court found in the M&O, "Plaintiff alleges that she is housed around 'institutionally violent' inmates, but fails to allege that she relayed any specific threats to Defendants or that Defendants were aware of a strong likelihood of injury to her." (Doc. 13, at 5) (citing *Gray v. Sorrels*, 744 F. App'x 563, 571 (10th Cir. 2018) (unpublished) (finding allegations of failure to protect too conclusory to establish personal participation and failure to allege specific content of emails); *see also Leonard v. Lincoln Cty. Bd. of Comm'rs*, 790 F. App'x 891, 894 (10th Cir. 2019) (unpublished) (finding plaintiff's general request and grievance did not put jail officials on notice that he was at risk of being assaulted)).

Even though Plaintiff insists that this is a safety issue and she is not arguing about her housing assignment, she has not shown any threat toward her personally or any failure to protect her from other inmates housed near her. Instead, her argument is no different than an argument that she should be housed around non-violent inmates, which is an argument about her security classification and housing assignment. The Court held in the M&O that "Plaintiff has not shown that her assignment imposed any atypical and significant hardship in relation to the ordinary incidents of prison life." (Doc. 13, at 6.) Plaintiff does not have a constitutional right to dictate where she is housed, whether it is which facility or which classification within a facility. *See Schell v. Evans*, 550 F. App'x 553, 557 (10th Cir. 2013) (citing *Meachum*, 427 U.S. at 228–29; *Cardoso v. Calbone*, 490 F.3d 1194, 1197–98 (10th Cir. 2007). Moreover, prison officials are entitled to great deference in the internal operation and administration of the facility. *See Bell v. Wolfish*, 441 U.S. 520, 547–48 (1979). The Court dismissed any claim regarding Plaintiff's security classification and housing at TCF. (Doc. 13, at 7.)

The Court found in the M&O II that Plaintiff's allegations in Count II under "safety" then seem to pivot into an equal protection argument. She alleges that she is "the only individual who is not a disciplinary issue that cannot participate in any programming, classes, dog program, or anything at all at the prison (TCF)." *Id.* at 16. Plaintiff alleges that there are male inmates who have the same charges and are non-disciplinary who have access to these programs and housing, and there are female inmates in the same comparison group but Plaintiff is treated differently in violation of equal protection. *Id*.

The Court found that Plaintiff failed to identify any program or class that she sought to participate in at TCF and was denied. The Court also found that Plaintiff failed to allege that she was treated differently than other inmates that were similarly situated in every material respect. The Court ordered Plaintiff to show good cause why her failure to protect and equal protection claims should not be dismissed. Plaintiff does not address her failure to protect and equal protection claims in her response. *See* Doc. 28. Plaintiff's failure to protect and equal protection claims based on "safety" are dismissed for failure to state a claim.

**6. Count III – Freedom of Religion**

As Count III, Plaintiff alleges violations of her right to freely exercise her religion and an equal protection violation. The Court found in the M&O II that Plaintiff's First Amendment claim in Count III alleging a violation of the Free Exercise Clause survives screening. The Court found that Plaintiff alleged a sufficient burden to survive screening, and that Defendants will have an opportunity to respond regarding whether a penological interest exists and regarding the reasonableness of the conduct creating the burden.

However, the Court found in the M&O II that to the extent Plaintiff raises an equal protection claim in Count III, the claim is subject to dismissal for failure to state a claim.

16

Plaintiff argues that she was told that male inmates are allowed to attend as many church services as they like and with any religion. (Doc. 12, at 18.) TCF's Chaplain, Jesse Waller, denies having told Plaintiff that her religious freedoms were being limited by any person or entity at TCF and denies having told Plaintiff that male residents have any greater freedom to pursue religious interests than female residents. The Report states that all residents have equal access and involvement in religious services regardless of their sex or gender.

The Report provides that residents are not able to choose more than one religion affiliation per IMPP 10–110D. The KDOC's Internal Management Policy & Procedure ("IMPP") 10–110D states that it applies "Department-Wide." (Doc. 24–15, at 1.) The IMPP refers to "residents" without a distinction between male and female inmates. Plaintiff has not alleged sufficient facts to show that female inmates were treated differently than male inmates. The Court ordered Plaintiff to show good cause why her equal protection claim in Count III should not be dismissed for failure to state a claim.

In her response, Plaintiff merely states that Chaplin Waller did make a statement that male inmates do not face the same challenges regarding Jewish services. (Doc. 28, at 6.) Plaintiff has failed to show good cause why her equal protection claim in Count III should not be dismissed for failure to state a claim.

    **7. Count IV – Retaliation**

Plaintiff alleges retaliation as Count IV. Plaintiff alleges that she has been subjected to retaliation for filing her state habeas case and this § 1983 case. Plaintiff alleges that she received a letter on February 1, indicating she was being investigated for her tablet use and that the tablet would be revoked during the investigation. Plaintiff alleges that this was done in retaliation for her filing grievances and the PREA. She alleges that the DR she received did not have tablet

suspension as part of the punishment, and her tablet use was suspended to keep her from filing electronic grievances. Plaintiff also alleges that after filing this § 1983 action, she has been subjected to lengthy room searches. She claims that a search on the day she filed this action lasted an hour, and another search on March 22, 2024, lasted three hours and ten minutes and included staff going through her legal box and reading information. Plaintiff was told that the officer was looking for a number. Plaintiff also alleges that her job as porter was taken away as a form of retaliation.

The Court noted in the M&O II that it had already addressed Plaintiff's claim of retaliation for filing a PREA report and the loss of her porter job, and found that the claim is subject to dismissal. The Court found that nothing related to Plaintiff's disciplinary proceedings regarding her tablet use suggests retaliation. Plaintiff alleges that her disciplinary proceedings were retaliation for filing a state habeas action and this § 1983 action. (Doc. 12, at 20.) Plaintiff filed this § 1983 action on February 16, 2024, and filed her state habeas action on April 3, 2024. *See Stauch v. Kansas Dep't of Corr.*, Case No. 2024-CV-000254 (District Court of Shawnee County, Kansas) (filed April 3, 2024). The Court found that Plaintiff's tablet was confiscated on February 1, 2024–*prior to* filing this § 1983 action and *prior to* filing her state habeas action. Plaintiff claims that on February 1, she was told that her state habeas was sent to the Federal District Court instead of the state e-file address. (Doc. 12, at 21.)

Plaintiff's tablet was confiscated when TCF's EAI became aware that she had sold a pair of her sweatpants on eBay through a third party for $200. The DR for the violation was issued on February 15, 2024. The Court found in the MOSC that "[i]f she was using the tablet to process online orders, this could be the rationale for the 10-day restriction on use of the tablet, instead of an attempt to prevent her from filing grievances on the tablet." (Doc. 11, at 22.) The

18

Report shows that her tablet was removed from her possession after she was found abusing the electronic messaging system and selling her clothing via a third party on eBay. Plaintiff regained electronic access to her tablet on May 1, 2024. (Doc. 24–5, at 2.)

The Report also alleges that Plaintiff has not filed a grievance about lengthy room searches and the only lengthy cell search potentially applicable would not have been a search, but a pack-out of Plaintiff's property when she was placed on Crisis Level. The Court found in the M&O II that Plaintiff failed to state a retaliation claim based on her disciplinary proceedings regarding use of the tablet or lengthy cell searches and ordered her to show good cause why this claim should not be dismissed for failure to state a claim.

Plaintiff asked the Court to also consider her transfer to KDOC from CDOC as a form of retaliation. She claims that her transfer was in retaliation for filing grievances in Colorado. The Court found in the M&O II that Plaintiff's conclusory allegations that her transfer from Colorado to Kansas was retaliatory fails to state a claim. She was transferred after expressing concerns for her safety due to her high-profile criminal case. Plaintiff failed to show that the transfer would not have occurred but for a retaliatory motive.

The Court ordered Plaintiff to show good cause why her retaliation claim should not be dismissed for failure to state a claim. Plaintiff fails to address retaliation in her response. *See* Doc. 28. Plaintiff's retaliation claim in Count IV is dismissed for failure to state a claim.

**III. Conclusion**

The Court finds that Plaintiff's court access claim in Count I based on her legal mail survives screening. Plaintiff names the following defendants in this claim: Chavez, Hook, Zmuda, and Hartpence. (Doc. 12, at 7.) Plaintiff's Eighth Amendment claim in Count II based on sexual assault and her corresponding claim that staff failed to protect her from her abuser

survive screening. Plaintiff names the following defendants in these claims: Dietrick; Chavez; Hook; and Zmuda. *Id*. at 14. The Court also finds that Plaintiff's First Amendment claim in Count III alleging a violation of the Free Exercise Clause survives screening. Plaintiff names the following defendants in this claim: Chavez; Holthaus; Hook; and Zmuda. *Id*. at 19. All other claims and defendants are dismissed.

The Court's M&O provides that "[i]f the Amended Complaint survives screening the Court will enter a separate order serving the remaining defendants." (Doc. 13, at 11.) Therefore, the Court will enter a separate service order for service on Defendants Zmuda, Holthaus, Hook, Dietrick, Hartpence, and Chavez.

**IT IS THEREFORE ORDERED BY THE COURT** that the following claims survive screening: Plaintiff's court access claim in Count I based on her legal mail; Plaintiff's Eighth Amendment claim in Count II based on sexual assault and her corresponding claim that staff failed to protect her from her abuser; and Plaintiff's First Amendment claim in Count III alleging a violation of the Free Exercise Clause.

**IT IS FURTHER ORDERED** that all other remaining claims are dismissed for failure to state a claim.

**IT IS FURTHER ORDERED** that Plaintiff's claims against Defendants Turner and Van Dyke are dismissed.

**IT IS SO ORDERED**.

**Dated October 31, 2024, in Kansas City, Kansas.**

**S/ John W. Lungstrum**
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**
